Michael A. Gawley (SBN 294190)
J. Maxwell Cooper (SBN 284054)
KESSENICK, GAMMA & FREE, LLP
1 Post Street, Suite 2500
San Francisco, CA 94104
Telephone: (415) 362-9400
Facsimile: (415) 362-9401

Attorneys for Plaintiffs
*Samir Sairam, M.D.*
*Samir Sairam, M.D., Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Samir Sairam, M.D., an individual; Samir Sairam, M.D., Inc., a California professional corporation;<br><br>Plaintiffs,<br><br>vs.<br><br>Mercy Retirement and Care Center, a California corporation; Tamra Marie Tsanos, an individual,<br><br>Defendants. | Case No. 3:21-cv-04335-EMC<br><br>**FIRST AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs submit this First Amended Complaint.

## INTRODUCTION

1. For years, Samir Sairam, M.D. has been urging Mercy Retirement and Care Center ("Mercy") to adopt reasonably appropriate measures to protect patients and staff from care that is substandard, unnecessary, or dangerous to residents at Mercy. In response to his advocacy for medically appropriate care, Mercy terminated his medical directorship and interfered with his current and prospective patient relationships. Mercy's meddling with Dr. Sairam's patients has elevated expediency over safety, and has caused Dr. Sairam significant personal and financial damage.

## THE PARTIES, JURISDICTION, AND VENUE

2. Plaintiff Samir Sairam, M.D. ("Dr. Sairam") is a physician licensed to practice in California, specializing in geriatric medicine. Dr. Sairam has dedicated his life to treating older adults, which he finds rewarding. The combination of increased medical complexity and patient frailty provides Dr. Sairam the opportunity to support those in need at a time when they are particularly vulnerable. Dr. Sairam's patient-centered, holistic approach to maintaining older adults' functionality, independence, and quality of life has become a bedrock of his conscientious style of medicine.

3. Plaintiff Samir Sairam, M.D., Inc. ("Sairam Corp.") is a professional corporation organized under the laws of California. Sairam Corp. engages in the profession of medicine through Dr. Sairam and other healthcare practitioners. Its principal place of business is 912 Cole Street, Number 289, San Francisco, CA, 94117.

4. Defendant Mercy Retirement and Care Center is a nonprofit corporation organized under the laws of California. Defendant runs a skilled nursing facility in Alameda County, and has its principal place of business at 1301 Marina Village Parkway, Suite 210, Alameda CA 94501.

5. Defendant Tamra Marie Tsanos is, and was at all relevant times, the Executive Director of Defendant Mercy Retirement and Care Center, in Alameda County.

6. This Court has jurisdiction under 28 U.S.C. § 1441(c)(1), and was removed pursuant to 28 U.S.C. §§ 1441(a) and 1446(b). Plaintiffs have alleged cases of action under 18 U.S.C. §

1962 (Civil RICO), and all other causes of action are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367.

7.  Venue is appropriate pursuant to 28 U.S.C. §§ 1390(c), 1441(a), 1391(b)(1) and (2).

**FACTUAL ALLEGATIONS**

8.  Both federal and state law require Mercy to designate a licensed physician to serve as medical director. 42 C.F.R. § 483.70(h); Cal. Code Regs. tit. 22, § 72305(a). In 2017, Mercy engaged Dr. Sairam to serve as the Medical Director for Mercy. Mercy and Dr. Sairam signed a contract in 2017 entitled "Mercy Retirement and Care Center Medical Director Agreement." Under this contract, Mercy engaged Dr. Sairam individually to perform services as a "physician duly licensed in California with a background and experience in providing and administering health care services for the elderly." The contract permits Dr. Sairam to assign benefits under the Agreement to a professional corporation in which he is the sole shareholder (Sairam Corp.) but states that Dr. Sairam "continues to be personally responsible for providing the Services herein."

9.  As Medical Director, Dr. Sairam became generally responsible for standards, coordination, surveillance, and planning for improvement of medical care at Mercy. Dr. Sairam acted as a liaison between Mercy's administration and residents' attending physicians, was responsible for reviewing and evaluating administrative and patient care policies and procedures, and consulted with Mercy's director relating to patient care services.

10.  In addition to serving as Mercy's Medical Director, Dr. Sairam is the attending physician for dozens of residents at Mercy.[1] As attending physician, Dr. Sairam is the primary provider of medical care of his patients at Mercy.

11.  Sairam Corp. employs a nurse practitioner who (under Dr. Sairam's supervision) treats Dr. Sairam's patients at Mercy. Both Dr. Sairam's services and the nurse practitioner's services are billed through Sairam Corp. Thus, both Dr. Sairam and Sairam Corp. have relationships with Dr. Sairam's patients at Mercy.

---

[1] Plaintiffs use the terms "patient" and "resident" interchangeably to refer to persons who live at Mercy.

3
FIRST AMENDED COMPLAINT

12. In his time at Mercy, Dr. Sairam has consistently advocated for medically appropriate care, only to be rebuffed by Mercy's administration again and again.

13. A recent example involved Patient A who, in Dr. Sairam's medical opinion, retained sufficient lucidity to make healthcare decisions when admitted to the nursing home. Importantly, the law places the determination of patient capacity in the hands of physicians—**not** facility administrators. Cal. Code Regs. tit. 22, § 72527(c) ("The patient's incapacity shall be determined by a court in accordance with state law or by the patient's physician[.]").

14. Unfortunately, Patient A's condition deteriorated last year after contracting COVID-19. Dr. Sairam determined that Patient A no longer had capacity to make healthcare decisions and appropriately consulted with Patient A's next of kin. Cal. Code Regs. tit. 22, § 72527(d) (authorizing patient's next of kin as a person who may act as the patient's representative). Because of Patient A's grave condition and dire prognosis, Patient A's next of kin requested that Dr. Sairam enter a do not resuscitate ("DNR") order in the patient's chart. California law protects this decision from outside interference as a fundamental right. *See* Cal. Probate Code § 4650(a) (recognizing the decision to have life-sustaining treatment withheld or withdrawn as a fundamental right; *see also* Cal. Probate Code § 4780(b) (authorizing a "legally recognized health care decisionmaker" to direct health care providers regarding resuscitative measures). Both physicians (like Dr. Sairam) and facilities (like Mercy) must treat patients consistent with DNR orders. Cal. Probate Code § 4781.2(a) (requiring healthcare providers to treat patients in accordance with orders for life sustaining treatment); *Id.* § 4785 (applying rule when DNR orders are executed within a healthcare institution).

15. Despite Dr. Sairam's lawful entry of a DNR order pursuant to the request of Patient A's next of kin, Mercy's administrator Nicole Foreman put inappropriate pressure on Dr. Sairam to change the DNR order to a full resuscitation order. Dr. Sairam refused, consistent with his legal and ethical obligations. Undeterred—and lacking any legal authority—Ms. Foreman reversed Dr. Sairam's DNR order and entered in Patient A's chart a full resuscitation order, arguing that neither Dr. Sairam nor the patient's next of kin could change Patient A's code status to DNR.

16. A few days after Ms. Foreman unilaterally and unlawfully reversed the DNR order, Patient A suffered cardiac arrest. A full resuscitation was ordered, which consisted of crashing the

patient's chest cavity. This continued for some time after the patient was clearly dead. Mercy's actions contravened California law, because the "prolongation of the process of dying for [the patient] for whom continued health care [would] not [have] improve[d] the prognosis for recovery" undeniably "violate[d] patient dignity and cause[d] unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the [patient]." Cal. Probate Code § 4650(b).

17. After this incident, Dr. Sairam complained to Mercy's Executive Director, Defendant Tamra Marie Tsanos, about Ms. Foreman's override of Dr. Sairam's order. In lodging this complaint, Dr. Sairam urged Mercy to provide medically appropriate care—chiefly by ***not*** overriding the lawful healthcare orders of physicians.

18. Shortly after Patient A's death, Dr. Sairam unexpectedly received notice on January 4, 2021 that Mercy was terminating his medical directorship, effective March 4, 2021. The termination notice was sent and signed by Defendant Tamra Marie Tsanos.

19. When Dr. Sairam asked Mercy why it was terminating his medical directorship, Mercy responded that one reason was Dr. Sairam was driving away other practitioners from the facility. Underlying Mercy's purported justification was Dr. Sairam's history of blowing the whistle on substandard care or fraudulent billing practices at the facility.

20. For example, shortly after joining Mercy, Dr. Sairam noticed that at least one physician at Mercy would send medical scribes (non-professional personnel who assist healthcare practitioners in charting physician-patient encounters in real time) to treat residents at Mercy. This physician would not examine his patients in person, but would have the medical scribe create notes as is he had completed the patient visit in person. A medical scribe, unlike an allied health professional, has no formal medical training or license and cannot treat patients. Nonetheless, this physician would bill Medicare as if he had personally performed the services charted by the medical scribe. Dr. Sairam complained to Mercy about this practice. Understandably, physicians with questionable billing practices don't want to practice in a facility where the medical director scrutinizes those practices.

21. On the care side, Dr. Sairam has also complained to Mercy about physicians who perform medically unnecessary procedures on patients—some of whom are incapacitated and can-

not object to the treatment. This includes one case in which Dr. Sairam notified Mercy of a physician who performed an unnecessary skin biopsy on a patient with known chronic changes from radiation treatments of his rectal cancer. The wound care physician performed a biopsy of the perianal area without first checking the patient's medical history and without consent from the patient's representative. When Dr. Sairam spoke with the physician about this practice, the physician stated that it was his company's practice to biopsy all wounds and that he did not check the patient's medical history or ask whether there was preexisting cancer in the area being biopsied. Dr. Sairam has other examples of wound care physicians being allowed by Mercy to perform unnecessary wound debridements, leading to systemic infections and sepsis in patients. Also, other physicians routinely documented inaccurate measurements and severity of the wounds to make them appear to be more severe, presumably to justify larger bills.

22. Dr. Sairam raised these concerns to Mercy and took reasonable steps as Medical Director to prevent substandard physicians from practicing at Mercy—including by setting up an internal wound care protocol, that enabled Mercy to treat its patients without the need of third-party consultants.

23. With these examples in mind, it is no surprise that substandard practitioners have no interest in practicing at Mercy—so long as Dr. Sairam is around. But given the option of keeping Dr. Sairam and encouraging above-board billing and care practices or attracting practitioners who have no scruples about cutting corners if it improves the bottom line, Mercy has chosen the latter.

24. In short, the timing of Mercy's termination makes clear that Mercy was fed up with Dr. Sairam's refusal to place patient well-being second to profits and administrative expediency. This was confirmed when Dr. Sairam asked Mercy for its purported justification for terminating his medical directorship.

25. In addition to terminating Dr. Sairam's medical directorship, Mercy retaliated against Dr. Sairam by interfering with Dr. Sairam's patient-physician relationship with residents at Mercy. Just weeks after terminating his medical directorship in January 2021, Mercy (through its Executive Director Tamra Marie Tsanos) mailed a letter to residents or their authorized representatives, announcing Dr. Sairam's departure as medical director. This letter misleadingly states that Dr. Sairam

"will be leaving us as of March 3, 2021," and states that Mercy "greatly appreciate[s] his physician services these past years" and "wish[es] Dr. Sairam well in his future endeavors." This letter created the impression that Dr. Sairam would no longer treat patients at Mercy as their attending physician. The letter also introduced Dr. Gurpreet Dhugga to residents as the new medical director, making it seem like their medical care is being reassigned to Dr. Dhugga. Mercy did not discuss this letter with Dr. Sairam before sending it; Dr. Sairam only learned of the letter when understandably confused patients and family members asked him why he could no longer be their attending physician. Dr. Sairam has been required to address this deceptive letter with his patients and family members, assuring them that he—not Dr. Dhugga—is still their attending physician.

26. Mercy's interference didn't stop there. Ms. Foreman, Mercy's administrator, emailed Dr. Sairam on February 2, 2021, stating that Mercy's new "[m]edical director and following physicians would like to start to transition 10 residents a week to their care so that come March 4th everyone has been transferred over." This email contained no indication that any patient or patient representative had requested—let alone authorized—a move away from Dr. Sairam as their attending physician. Nor did the email explain why transferring primary medical care to the new "following physicians"—synonymous with attending physicians—was necessary or appropriate. Dr. Sairam did not respond to this email.

27. Doubling-down on Mercy's efforts to transfer patients into the care of other physicians without their consent, Malinda Fay, Mercy's Director of Nursing, sent Dr. Sairam an email on February 9, 2021, stating that ten residents would be transferred to another provider that very week. Again, Mercy provided no indication that any patient or patient representative asked for these transfers to take place, and did not explain why such transfers were necessary or appropriate.

28. The next day, February 10, 2021, Dr. Sairam, through counsel, sent Mercy a cease-and-desist letter informing Mercy of its obligation to honor patient choice and demanding that Mercy cease and desist from unilaterally transferring patient care. This time it took Mercy less than twenty-four hours to retaliate against Dr. Sairam. On February 11, 2021, Mercy threatened to bar Dr. Sairam from the premises, for alleged violations of Mercy's COVID-19 protocol, even though

Dr. Sairam has followed all COVID-19 protocols and policy at Mercy.  Mercy never complained to Dr. Sairam about his COVID-19 protocol compliance before he sent his cease-and-desist letter.

29. In February 2021, Mercy asked Dr. Sairam to approve a proposed communication to his patients, which asked them to confirm whether they want to continue with Dr. Sairam as their attending physician. Dr. Sairam objected to the communication.  Dr. Sairam explained that Mercy's change in medical director does not change Dr. Sairam's ability to treat patients at Mercy.  Moreover, residents have the right to choose their attending physician free of interference or coercion from Mercy.  Mercy's proposed letter violated this right by inviting patients—who have neither requested nor authorized a transition in care—to leave Dr. Sairam's care.  Not only that, but the proposed transfer of care presented an unnecessary danger to patients.  Dr. Sairam has explained to Mercy that, as a clinical matter, continuity of care is especially important for patients suffering from dementia or cognitive decline—like many of Dr. Sairam's patients at Mercy.  Disrupting the patient-physician relationship in these patients has been shown to increase emergency room visits and hospitalizations.  And specific to Mercy, its letter to residents proposed transferring Dr. Sairam's patients to a physician in Dr. Dhugga's practice who is on probation with the California Medical Board through October 2023.  This physician's probation prohibits the physician from supervising physician assistants and advanced practice nurses at Mercy, which an integral and necessary part of attending physicians at skilled nursing facilities.  Despite Dr. Sairam's objections and patient safety concerns, Mercy mailed this letter to his patients and their representatives, causing several of his patients to leave his care.

30. Dr. Sairam has also learned that Mercy personnel are telling patient representatives that Dr. Sairam cannot be reached to discuss resident care, and refusing to provide Dr. Sairam's phone number to those who request it.  Dr. Sairam has also been told that Mercy is encouraging patients who do not have capacity to transition away from his care.

31. Despite Dr. Sairam's efforts to mitigate, much of the damage has already been done.  A handful of his patients at Mercy have purportedly opted to leave Dr. Sairam's care.   The catalyst of this change was Mercy, not the patients.  Mercy continues to steer patients to the care of Dr. Dhugga and his associates.

32. As of the filing of this complaint, Mercy has never explained to Dr. Sairam why the transfer of care for his patients was necessary or appropriate.

33. Retaliation against Dr. Sairam and Mercy's violation of the law continues. For example, on June 14, 2021, Mercy informed Dr. Sairam of several policy changes it was making. One such change was that "All persons admitted or accepted for care by this community must be under the care of a physician selected by the resident, the resident's authorized representative, *or the medical director*." (Emphasis added.) This provision appears in conflict with federal and state law vesting the right to choose an attending physician with the resident or resident representative.

34. Mercy adopted another policy which states "To maintain clear communication between all practitioners caring for the resident and to preserve documentation of that care, email communication between practitioners and community staff including but not limited to patient care, COC or physician order is not allowed at this community." This policy change interferes with Dr. Sairam's treatment of his patients. For years, Dr. Sairam has communicated with Mercy's clinical staff by email. Mercy's new policy erects a hurdle that interferes with Dr. Sairam's efficient treatment of his patients. Forcing Dr. Sairam to find a fax machine whenever he needs to communicate orders with nurses serves no legitimate clinical function. And when Dr. Sairam has tried to reach Mercy staff by phone, often nobody answers the call and he has to call back multiple times before somebody picks up the phone. Communicating by email, in contrast, provides Dr. Sairam a direct mode of communication to Mercy's clinical staff and accurately documents Dr. Sairam's orders. Moreover, Mercy's new no-email policy runs counter to numerous laws protecting reasonable access to residents and the use of email in long-term care facilities. *See*, *e.g.*, 42 C.F.R. §§ 483.10(f)(4)(iv), (g)(9); 42 C.F.R. § 483.70(b); Cal. Code Regs. tit. 22, § 72301(f).

**FIRST CAUSE OF ACTION**

**Intentional Interference with Contractual Relationships**

**Against All Defendants**

35. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

36. At all relevant times, Plaintiffs are and were parties to contracts with each resident at Mercy for whom Dr. Sairam was attending physician ("Patient Contracts"). At all relevant times, the Patient Contracts were valid and enforceable. At all relevant times, Mercy and Ms. Tsanos knew about these Patient Contracts.

37. Starting in January 2021, Mercy and Ms. Tsanos intentionally interfered with and disrupted the contractual relationship between Plaintiffs and Dr. Sairam's residents by taking the wrongful actions described above, which were intended to mislead or coerce Dr. Sairam's patients to terminate their Patient Contracts.

38. Defendants' actions disrupted the contractual relationship between Plaintiffs and Dr. Sairam's residents, causing Dr. Sairam's patients to terminate their Patient Contracts and transfer their medical care at Mercy to another attending physician.

39. Defendants knew that interference with the contractual relationships between Plaintiffs and Dr. Sairam's patients at Mercy was certain or substantially certain to occur as a result of Defendants' wrongful conduct.

40. Defendants' interference was independently wrongful for reasons described above, including that (1) they retaliated against Dr. Sairam because he advocated for appropriate medical care for residents at Mercy, and (2) they interfered with the residents' legally protected right to choose his or her attending physician.

41. Defendants' interference was a substantial factor in causing Plaintiffs to suffer damages and other harm (including harm to professional reputation and goodwill), which are ongoing. Under the Patient Contracts, Dr. Sairam agreed to treat residents at Mercy as their attending physician in exchange for the right to bill the resident's insurer for payment. This agreement also allowed Sairam Corp.'s nurse practitioner to treat Dr. Sairam's patients (under Dr. Sairam's supervision). Both Dr. Sairam's services and the nurse practitioner's services were billed through Sairam Corp. Once the patients terminate their Patient Contracts by transferring care to another attending physician, Plaintiffs can no longer generate revenue from the resident's insurer for payment as the resident's attending physician.

42. Plaintiffs are entitled to punitive damages as a result of Defendants' conduct.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### Against All Defendants

43. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

44. Prior to March 4, 2021, Dr. Sairam was contracted with Mercy to be their medical director. This was an ongoing relationship between Dr. Sairam and Mercy, and carried with it economic benefits to Plaintiffs primarily by positioning Dr. Sairam to form patient-physician relationships with residents at Mercy as their attending physician. Throughout his medical directorship, nearly all of Dr. Sairam's patient-physician relationships with residents at Mercy were formed as a direct result of his position as Mercy's medical director; put another way, it is nearly impossible, as a practical matter, to become the attending physician for residents at Mercy without also being the medical director. Thus, Dr. Sairam's medical directorship created an economic relationship between Plaintiffs and future residents at Mercy, and this economic relationship carried a probability of an economic benefit.

45. Defendants had knowledge of the economic relationship between Plaintiffs and Mercy's future residents. Defendants knew that interference with the relationship between Dr. Sairam and future residents at Mercy was certain or substantially certain to occur as a result of Defendants' wrongful conduct. By terminating Dr. Sairam's medical directorship, Defendants took deliberate action to interfere with the economic relationship between Plaintiffs and Mercy's future residents.

46. Defendants' interference was wrongful for a number of reasons, including (1) they retaliated against Dr. Sairam because he advocated for appropriate medical care for residents at Mercy and (2) they interfered with the residents' legally protected right to choose his or her attending physician.

47. Defendants' interference was a substantial factor in causing Plaintiffs to suffer damages and other economic harm (including harm to professional reputation and goodwill), which are ongoing.

48. Plaintiffs are entitled to punitive damages as a result of Defendants' conduct.

### THIRD CAUSE OF ACTION

**Violation of Business & Professions Code, § 510**

**Against All Defendants**

49. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

50. As alleged above, Dr. Sairam is a health care practitioner who advocated for appropriate health care for the residents at Mercy. In particular, Dr. Sairam protested decisions, policies, and practices that he, consistent with that degree of learning and skill ordinarily possessed by reputable health care practitioners with the same license or certification and practicing according to the applicable legal standard of care, reasonably believed impaired the health care practitioner's ability to provide appropriate health care to residents at Mercy.

51. Defendants terminated Dr. Sairam's medical directorship with Mercy and otherwise penalized Plaintiffs principally for advocating for appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable health care practitioners with the same license or certification and practicing according to the applicable legal standard of care. Defendants actions violation the public policy of California as embodied in Business & Professions Code section 510.

52. Defendants' retaliatory acts have caused Plaintiffs damages and other economic harm (including harm to professional reputation and goodwill).

53. Plaintiffs are entitled to punitive damages as a result of Defendants' conduct.

### FOURTH CAUSE OF ACTION

**Violation of California Business & Professions Code, § 2056**

**Against All Defendants**

54. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

55. As alleged above, Dr. Sairam is a licensed physician who advocated for appropriate health care for the residents at Mercy. In particular, Dr. Sairam protested decisions, policies, and practices that he, consistent with that degree of learning and skill ordinarily possessed by reputable

physicians practicing according to the applicable legal standard of care, reasonably believed impaired the physician's ability to provide medically appropriate health care to residents at Mercy.

56. Defendants terminated Dr. Sairam's medical directorship with Mercy and otherwise penalized Plaintiffs principally for advocating for medically appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care. Defendants' actions violation the public policy of California as embodied in Business & Professions Code section 2056.

57. Defendants' retaliatory acts have caused Plaintiffs damages and other economic harm (including harm to professional reputation and goodwill).

58. Plaintiffs are entitled to punitive damages as a result of Defendants' conduct.

## FIFTH CAUSE OF ACTION

### Civil RICO, 18 U.S.C. § 1962(c) and (d)

### Against All Defendants

59. Plaintiffs realleges and incorporates by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

60. Defendants violated the federal RICO statute, and Plaintiffs were injured as a result.

61. Defendants violated 18 U.S.C. § 1962(c) and (d) by the acts described in prior paragraphs, and as further described below.

62. At all times relevant herein, each Defendant was and is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In violation of Sections 1962(c) and (d), Mercy and Ms. Tsanos conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of enterprise affairs through a pattern of racketeering activity, thereby proximately causing injury to Plaintiffs' businesses or property. The purpose of this enterprise is to maximize profits by violating its legal obligations to Mercy's residents and physicians. Each Defendant knew the essential nature and scope of the enterprise that they were employed by or associated with, and each of the Defendants intended to participate in the affairs of the particular enterprise.

63. Mercy is and has been a RICO enterprise as that term is defined in 18 U.S.C. 1961(4). At all times relevant hereto, the activities of Mercy affected interstate or foreign commerce. Ms. Tsanos was employed by or associated with Mercy as Executive Director. In violation of Section 1962(c) and (d), Defendants conducted and/or conspired to conduct the affairs of Mercy through a pattern of racketeering activity.

64. In the alternative, there existed an associated-in-fact enterprise consisting of Mercy and Ms. Tsanos. Each Defendant is a member of the associated-in-fact-enterprise, voluntarily agreed to join the enterprise and played an active role in its affairs. Each of the members of the associated-in-fact enterprise are persons or legally incorporated entities that conducted (and conduct) business activities through the United States. The activities of the associated-in-fact enterprise affected interstate and/or foreign commerce. The members of the enterprise, including each Defendant, continue their professional and business activities to date. Each member of the associated-in-fact enterprise conducted and/or conspired to conduct the affairs of the associated-in-fact enterprise through a pattern of racketeering activity.

65. Defendants have knowingly and willfully engaged in a pattern of racketeering activity by, among other acts, mailing letters (signed by Ms. Tsanos on behalf of Mercy) to all of Dr. Sairam's patients at Mercy to obtain money or property by means of false pretenses and representations about Dr. Sairam in violation of 18 U.S.C. § 1341 and by submitting claims for payment to the federal government that, either expressly or implicitly, certify compliance with the laws and regulations regarding the provision of healthcare services, despite the pattern of legal violations outlined above, in violation of 18 U.S.C. § 1343.[2]

---

[2] In accordance with §§ 1815(a) and 1861(v)(1)(A) of the Paperwork Reduction Act, providers in the Medicare program are required to submit annual information to achieve settlement of costs for health care services rendered to Medicare beneficiaries. In addition, 42 C.F.R. §§ 413.20 and 413.24 require adequate cost data and cost reports from providers on an annual basis. In accordance with these provisions, Form CMS-2540-10 must be completed by all skilled nursing facilities (including Mercy) and submitted electronically. Each CMS-2540-10 form submitted by Mercy certifies that Mercy's representatives are "familiar with the laws and regulations regarding the provision of health care services, and that the service identified in this cost report were pro-vided in compliance with such laws and regulations." And, as explained on the Center for Medicare and Medicaid Services website, "[s]killed nursing facilities (SNFs) and nursing facilities (NFs) are required to be in compliance with the requirements in 42 C.F.R Part 483, Subpart B, to receive payment under the

66. Plaintiffs have suffered injury directly and foreseeably by reason of Defendants' violations of 18 U.S.C. § 1962, in an amount to be determined at trial. Plaintiffs are entitled to compensation for these damages, and for treble damages, the cost of suit, and reasonable attorneys' fees. 18 U.S.C. § 1964(c).

### SIXTH CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

### Against Mercy

67. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

68. Being hiring Dr. Sairam as Mercy's Medical Director in 2017, Mercy and Dr. Sairam formed an employer-employee relationship for Dr. Sairam's responsibilities as Medical Director.

69. On January 4, 2021, Mercy notified Dr. Sairam that it was terminating his medical directorship effective March 4, 2021.

70. Mercy's termination of Dr. Sairam's medical directorship violated public policy, as described above. Mercy's actions were in retaliation for advocating for medically appropriate health care, in violation of Business & Professions Code sections 510 and 2056.

71. Mercy's termination of Dr. Sairam's medical directorship has caused him damages, including lost wages and harm to his reputation and goodwill.

### SEVENTH CAUSE OF ACTION

### Violation of Business & Professions Code, § 17200

### Against Mercy

72. Plaintiffs reallege and incorporate by reference each and every allegation of the paragraphs above, inclusive, as though set forth fully herein.

73. Mercy is a corporation doing business in California as a skilled nursing facility.

74. Business & Professions Code section 17200 prohibits any "unlawful, unfair or fraudulent business acts or practices."

---

Medicare or Medicaid programs." https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/NHs (accessed on February 26, 2021).

75. Mercy's conduct violations this law by engaging in unlawful, unfair, and fraudulent practices.

76. Mercy's unlawful practices include, but are not limited to:

    a. Retaliatory termination of Dr. Sairam's medical directorship, in violation of Business & Professions Code sections 510 and 2056;

    b. Overriding Dr. Sairam's medical decision-making authority, in violation of California's bar on the corporate practice of medicine (*California Physicians' Service v. Aoki Diabetes Research Institute*, 163 Cal. App. 4th 1506, 1514 (2008); Cal. Code Regs. tit. 22, § 72527(c) ("The patient's incapacity shall be determined by a court in accordance with state law or by the patient's physician[.]");

    c. Interfering with the resident's right to choose his or her own attending physician, in violation of 42 C.F.R. § 483.10(b)(2) and Cal. Code Regs. tit. 22, § 72303(a); and

    d. Failing to ensure that all orders lawfully submitted by email by Dr. Sairam are carried out unless contraindicated and otherwise impermissibly restricting Dr. Sairam's ability to treat patients at Mercy. *See* 42 C.F.R. §§ 483.10(f)(4)(iv), (g)(9); 42 C.F.R. § 483.70(b); Cal. Code Regs. tit. 22, § 72301(f).

77. Mercy's unlawful practices include, but are not limited to:

    a. Elevating profit-enhancing expedience at the expense of resident rights. This predicate act:

        (1) violates the public policy tethered to various laws, including law authorizing the right of patients and their representatives to have life-sustaining treatment withheld or withdrawn (Cal. Code Regs. tit. 22, § 72527(d) (authorizing patient's next of kin as a person who may act as the patient's representative); Cal. Probate Code § 4650 (a) (recognizing the decision to have life-sustaining treatment withheld or withdrawn as a fundamental right); Cal. Probate Code § 4780(b) (authorizing a "legally recognized health care decisionmaker" to direct health

1  care providers regarding resuscitative measures)), law protecting the right of residents to choose their own attending physician (42 C.F.R. § 483.10(b)(2); Cal. Code Regs. tit. 22, § 72303 (a)), and law protected physicians from retaliation in response to advocating for medically appropriate health care (Cal Business & Professions Code §§ 510, 2056);

(2) is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; and

(3) created a substantial injury to patients and Dr. Sairam that was not reasonably avoidable and is not outweighed by any countervailing benefit to consumers or competition.

78. Mercy's fraudulent practices include, but are not limited to:

a. Knowingly mailing false, deceptive, and misleading letters to residents or their representatives, claiming that Dr. Sairam was leaving the facility and encouraging residents to transfer their care to another attending physician; and

b. Telling patient representatives who ask for Dr. Sairam that Dr. Sairam cannot be reached to discuss resident care.

79. Plaintiffs and Dr. Sairam's patients at Mercy will suffer irreparable harm and pecuniary losses if Mercy is not enjoined from its ongoing and threatened violation of the law.

80. As a direct and proximate result of Mercy's conduct, as alleged herein, Mercy has been and will be unjustly enriched.

81. Plaintiffs request all available relief, including but not limited to all such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by Mercy of any practice which constitutes unfair competition, as defined in Business & Professions Code section 17200 et seq., or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

//

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants as follows:

1. For damages in an amount to be proven at trial;
2. For the costs of this action;
3. For pre-judgment and post-judgment interest;
4. For attorneys' fees;
5. For treble damages;
6. For punitive damages;
7. For injunctive relief;
8. For such other any further relief as the Court may deem appropriate.

Dated: June 28, 2021                         KESSENICK, GAMMA & FREE, LLP

_____
Michael A. Gawley
1 Post Street, Suite 2500
San Francisco, CA 94104
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues and causes of action so triable.

Dated: June 28, 2021                         KESSENICK, GAMMA & FREE, LLP

_____
Michael A. Gawley
1 Post Street, Suite 2500
San Francisco, CA 94104
Attorneys for Plaintiffs