UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMIR SAIRAM, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MERCY RETIREMENT AND CARE CENTER, et al.,<br><br>    Defendants. | Case No. 21-cv-04335-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 8 |

Plaintiffs are Samir Sairam, a medical doctor, and an affiliated corporation known as Samir Sairam M.D. Inc. ("Sairam Inc."). Dr. Sairam previously worked at Mercy Retirement & Care Center ("Mercy"), a nursing facility. He served as its Medical Director and was also an attending physician for a number of its residents. Plaintiffs filed suit against Mercy and its Executive Director, Tamra Marie Tsanos, after Dr. Sairam was terminated as the Medical Director. Plaintiffs filed suit in state court, but Defendants removed because Plaintiffs had asserted a federal claim – specifically, a RICO claim. Currently pending before the Court is Defendants' motion to dismiss.

Having considered the parties' briefs and the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss but gives Plaintiffs leave to amend.

    **I.    FACTUAL & PROCEDURAL BACKGROUND**

In their complaint, Plaintiffs allege as follows.

Mercy is a nursing facility in Alameda County. Ms. Tsanos is its Executive Director. *See* FAC ¶¶ 4-5. Federal and state law require Mercy to designate a licensed physician to serve as its Medical Director. In 2017, Mercy hired Dr. Sairam to be its Medical Director. Under the employment agreement, Dr. Sairam was permitted to assign benefits under the agreement to

Sairam Inc., a corporation for which he is the sole shareholder.  *See* FAC ¶ 8.  As the Medical Director,

> Dr. Sairam became generally responsible for standards, coordination, surveillance, and planning for improvement of medical care at Mercy.  Dr. Sairam acted as a liaison between Mercy's administration and residents' attending physicians, was responsible for reviewing and evaluating administrative and patient care policies and procedures, and consulted with Mercy's director relating to patient care services.

FAC ¶ 9.

In addition to being Mercy's Medical Director, Dr. Sairam was the attending physician for a number of its residents.  "As attending physician, [he was] the primary provider of medical care of his patients at Mercy."  FAC ¶ 10.

Mercy terminated Dr. Sairam from the position of Medical Director in January 2021 (effective as of March 2021).  *See* FAC ¶ 18.  Mercy terminated Dr. Sairam because he had a history of complaining about (1) substandard care and/or (2) fraudulent billing practices.  *See* FAC ¶ 19.

As an example of (1), shortly before he was terminated, Dr. Sairam entered a do not resuscitate ("DNR") order in a patient's chart at the behest of the patient's next of kin (because the patient was no longer capable of making healthcare decisions).  See FAC ¶¶ 14-15.  An administrator at Mercy, Nicole Foreman, "put inappropriate pressure on Dr. Sairam to change the DNR order to a full resuscitation order."  FAC ¶ 14.  When Dr. Sairam refused, Ms. Foreman reversed the DNR order anyway.  A few days later, the patient suffered cardiac arrest and a full resuscitation was ordered.  This prolonged the process of dying for the patient.  After the incident, Dr. Sairam complained to Ms. Tsanos specifically about the override of his DNR order.  Soon thereafter, Dr. Sairam was notified that Mercy was terminating him from the Medical Director position.  Ms. Tsanos signed the termination notice.  See FAC ¶¶ 15-16.

As an example of (2), during his tenure as Medical Director, Dr. Sairam made complaints about "physicians who performed medically unnecessary procedures of patients."  FAC ¶ 21.  On one occasion, for instance, there was a wound care physician who "performed an unnecessary skin biopsy on a patient with known chronic changes from radiation treatments of his rectal cancer."

2

FAC ¶ 21. Implicitly, if physicians were performing medically unnecessary procedures, then patients should not have been billed for those procedures. Furthermore, Mercy should not have been submitting claims for payment to the federal government (as part of Medicare) based on those unnecessary procedures. *See* FAC ¶ 65.

As an example of both (1) and (2), shortly after joining Mercy, Dr. Sairam noticed that "at least one physician at Mercy would send medical scribes (non-professional personnel who assist healthcare practitioners in charting physician-patient encounters in real time) to treat residents at Mercy. This physician would not examine his patients in person, but would have the medical scribe create notes as [if] he had completed the patient visit in person." FAC ¶ 20. Dr. Sairam complained about this practice as well. *See* FAC ¶ 20.

After terminating Dr. Sairam, Mercy began to interfere with his relationships with Mercy patients for whom he acted as the attending physician. For example:

- A few weeks after terminating him from the Medical Director position, "Mercy (through its Executive Director [Ms.] Tsanos) mailed a letter to residents or their authorized representatives." FAC ¶ 25. The letter announced Dr. Sairam's departure as Medical Director but was misleading in suggesting that Dr. Sairam would no longer treat patients at Mercy as an attending physician. *See* FAC ¶ 25 (alleging that the letter stated that Dr. Sairam "'will be leaving us'" and that Mercy appreciated his services and wished him "'well in his future endeavors'"). The letter also misleadingly suggested that the new Medical Director, Dr. Gurpreet Dhugga, would take over as the attending physician for Dr. Sairam's patients. *See* FAC ¶ 25.

- In February 2021, Ms. Foreman (the administrator) informed Dr. Sairam by email that Mercy was in the process of transitioning the care of many residents from him to Dr. Dhugga or another physician. *See* FAC ¶ 26. "[The] email contained no indication that any patient or patient representative had requested – let alone authorized – a move away from Dr. Sairam." FAC ¶ 26.

- In February 2021, after Dr. Sairam (through counsel) demanded that Mercy stop

"unilaterally transferring patient care," Mercy immediately threatened to bar Dr. Sairam from the facility "for alleged violations of [its] COVID-19 protocol." FAC ¶ 28. "Mercy [had] never complained to Dr. Sairam about his COVID-19 protocol compliance before he sent his cease-and-desist letter." FAC ¶ 28.

- In February 2021, Mercy asked Dr. Sairam to approve a letter to be sent to his patients, "ask[ing] them to confirm whether they want[ed] to continue with Dr. Sairam as their attending physician" – *i.e.*, effectively inviting them to end their relationship with Dr. Sairam. FAC ¶ 29. In addition, Mercy's letter proposed that care be transferred to Dr. Dhugga even though he is "on probation with the California Medical Board through October 2023" (which "prohibits [him] from supervising physician assistants and advanced practice nurses at Mercy"). FAC ¶ 29. Dr. Sairam objected to the letter but it was still sent out and, as a result, several of his patients left his care. *See* FAC ¶ 29.
- Mercy personnel has told patient representatives that Dr. Sairam cannot be reached to discuss resident care and has refused to provide his phone number even if requested. *See* FAC ¶ 30.
- Mercy personnel has "encourage[d] patients who do not have capacity to transition away from his care." FAC ¶ 30.
- Mercy has adopted a policy that prohibits "email communication between practitioners and community staff including but not limited to patient care," even though Dr. Sairam has communicated with clinical staff by email for years and efficiently treated patients through this means. FAC ¶ 34 (adding, *e.g.*, that when Dr. Sairam has tried to reach Mercy staff by phone, "often nobody answers the call").

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of action:

(1) Intentional interference with contractual relationships.

(2) Intentional interference with prospective economic advantage.

4

  (3) Violation of California Business & Professions Code § 510.  *See generally* Cal. Bus. & Prof. Code § 510(c) (providing that it is a violation of public policy for a person or entity "to terminate an employment or other contractual relationship with or otherwise penalize a health care practitioner principally for advocating for appropriate health care").

  (4) Violation of California Business & Professions Code § 2056.  *See generally id.* § 2056(c) (providing the same with respect to physician and surgeon; adding that "[n]o person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy, nor shall any person prohibit, restrict, or in any way discourage a physician and surgeon from communicating to a patient information in furtherance of medically appropriate health care").

  (5) Violation of RICO.  *See* 18 U.S.C. § 1962(c)-(d) (providing that it is unlawful for a "person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity"; also providing that it is unlawful for a "person to conspire to violate" the above).

  (6) Wrongful termination in violation of public policy (against Mercy only).

  (7) Violation of California Business & Professions Code § 17200 (against Mercy only).

## II.  DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765

F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

B.    Timeliness of Motion to Dismiss

As an initial matter, the Court takes note of Plaintiffs' contention (made in a footnote) that the motion to dismiss is untimely.  *See* Opp'n at 7 n.2.  Federal Rule of Civil Procedure 15(c) provides that, "[u]nless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later."  Fed. R. Civ. P. 15(c).  Because Defendants filed an answer to Plaintiffs' original complaint, *see* Docket No. 1 (answer filed on 6/7/2021), Defendants should have had, under Rule 15(c), only 14 days to respond to the FAC.  Plaintiffs' FAC was filed on June 28, 2021.  Therefore, Defendants' response was due on July 12, 2021.  Defendants, however, did not file their motion to dismiss until July 19, 2021 (*i.e.*, one week later).

Although, technically, Defendants' motion appears to be late, the Court still has discretion to consider it – Rule 15(c) specifically states, "unless the court orders otherwise."  Fed. R. Civ. P. Moreover, under Rule 12(h)(2), a defense of failure to state a claim for relief may be raised "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."  Fed. R. Civ. P. 12(h)(2).  Therefore, it would make little sense to refuse consideration of Defendants' motion on the merits now.

C.    RICO Claim

The bulk of Defendants' motion is directed to the argument that the Court should dismiss

all claims against Ms. Tsanos, including but not limited to the RICO claim. According to Defendants, Plaintiffs have failed to allege facts demonstrating that Ms. Tsanos may be held personally liable.

However, for the RICO claim, Defendants make an argument which, if accepted, would require dismissal as to not only Ms. Tsanos but also Mercy. The Court also asked the parties to provide briefing on a RICO issue that could affect the claim as to both Defendants. Having considered that supplemental briefing, as well as the original briefing provided, the Court concludes that, as pled, the RICO claim is not viable.

For the RICO claim, Plaintiffs have invoked both 18 U.S.C. § 1962(c) and (d). Under § 1962(c), it is unlawful for a "person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Under § 1962(d), it is unlawful for a person to conspire to violate, *e.g.*, subsection (c) above.[1] *See id.* § 1962(d). "Racketeering activity" is defined to mean certain unlawful conduct, including but not limited to mail fraud (18 U.S.C. § 1341) and wire fraud (§ 1343). *See id.* § 1961(1). "Pattern of racketeering activity" means "at least two acts of racketeering activity . . . [,] the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Id.* § 1961(5).

In the case at bar, the racketeering activity identified by Plaintiffs falls into two buckets: (1) Defendants mailed misleading letters to Dr. Sairam's patients (*i.e.*, mail fraud[2]) and (2) Defendants "submit[ed] claims for [false] payment to the federal government" (*i.e.*, wire fraud). FAC ¶ 65. At the hearing on the motion to dismiss, the Court noted that, with respect to the wire fraud, the direct victim of the fraud was not Plaintiffs but rather the federal government. Indeed, it

---

[1] The Ninth Circuit has indicated that a corporation *can* engage in a RICO conspiracy with its own officers and representatives. *See Webster v. Omnitrition Int'l*, 79 F.3d 776, 787 (9th Cir. 1996) (disagreeing with defendant's argument that "a corporation cannot engage in a RICO conspiracy with its own officers and representatives").

[2] For mail fraud, the mailing itself need not be fraudulent. Mail fraud concerns using the mail to advance a fraudulent scheme. *See Schmuck v. United States*, 489 U.S. 705, 711, 715 (1989) (stating that the mail fraud statute reaches "instances in which the use of the mails is a part of the execution of the fraud"; adding that even "'innocent' mailings – ones that contain no false information – may supply the mailing element").

was difficult to see how Plaintiffs were harmed by the wire fraud at all. *Cf. Reddy v. Litton Indus.*, 912 F.2d 291, 294 (9th Cir. 1990) (holding that an employee who is wrongfully discharged for refusing to participate in an alleged pattern of racketeering activity lacks standing to sue under § 1962(c); the harm comes from the discharge from employment and not the pattern of racketeering activity); *see also Beck v. Prupis*, 529 U.S. 494, 495-96, 505-06 (2000) (in a case where plaintiff sued defendants for a RICO conspiracy, asserting that he was terminated from employment after engaging in whistle blowing, holding that a person injured by an overt act done in furtherance of a RICO conspiracy does not have a viable claim if the overt act was not an act of racketeering).

In their supplemental briefing, Plaintiffs do not make any claim that they suffered any harm as a result of the wire fraud. Rather, they argue that there is no requirement that a RICO plaintiff "'must suffer an injury from two or more predicate acts, or from *all* of the predicate acts'"; rather, "'a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1117 (9th Cir. 2017) (emphasis in original) (finding typicality requirement for class certification satisfied because "Campbell's injuries stem from the same scheme, although the specific predicate act that caused her injury may differ from the acts that caused injury to other class members"). Here, Plaintiffs assert that they were injured as a result of the mail fraud.

But Plaintiffs' position is viable only if the wire fraud and mail fraud can plausibly be considered part of a *pattern* of racketeering activity. The Supreme Court has noted that, for there to be a pattern of racketeering activity, a plaintiff cannot rely solely on the fact that there is more than one predicate act.

> In normal usage, the word "pattern" here would be taken to require more than just a multiplicity of racketeering predicates. A "pattern" is an "arrangement or order of things or activity, and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organization principle that renders them "ordered" or "arranged."

*H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Furthermore, the legislative history for RICO indicates that

> [a] pattern is not formed by "sporadic activity," and a person cannot

8

> "be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses."  Instead, "[t]he term 'pattern' itself requires the showing of a relationship" between the predicates, and of "'the threat of continuing activity.'"  "It is this factor of *continuity plus relationship* which combines to produce a pattern."  RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.

*Id.* at 239 (emphasis in original).

In the instant case, the critical question is whether Plaintiffs have plausibly alleged that the wire fraud and mail fraud are related.  In general, "[t]he relatedness test is not a cumbersome one for a RICO plaintiff."  *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991); *cf. Medallion Television Enters. v. SelecTV of Cal.*, 833 F.2d 1360, 1363 (9th Cir. 1987) (in a pre-*H.J.* case, stating that "[w]hether the predicate acts alleged or proven are sufficiently related is seldom at issue").  *See, e.g.*, *In re Juul Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 617 (N.D. Cal. 2020) (stating that, "even if Monsees's acts were made through different channels and made to different audiences (comments to Congress, regulators, the news media, or the public), the goal of the scheme to defraud . . . remains plausibly the same: to lull the public and government into false beliefs about the JUUL product and defendants' intent while defendants worked (contrary to those public statements) to increase nicotine addiction and specifically target the youth market").

Nevertheless, the relatedness requirement is not without any bite.  Predicate acts are related only if they "'have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *H.J.*, 492 U.S. at 240; *see also Heller Fin. v. Grammco Comput. Sales*, 71 F.3d 518, 525 (5th Cir. 1996) ("interpret[ing] the relationship prong of the pattern requirement to require more than an articulable factual nexus[;] [w]e take the clear import of the Supreme Court's admonition in *H.J. Inc.* to consider whether the predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission' to require that a RICO plaintiff must prove a relationship between the criminal aspects of the predicate criminal acts, thereby supporting the conclusion that the criminal acts are 'ordered' or 'arranged'").

9

Applying that test, courts have not always held that the asserted predicate acts are related. For example, in *Vild v. Visconsi*, 956 F.2d 560 (6th Cir. 1992), the plaintiff, an individual, brought a RICO claim against several defendants based on two types of predicate acts.

> The first type of conduct involves acts directed at the plaintiff [Vild] by the defendants. Vild is the alleged victim of fraudulent and unlawful acts which include allegations of mail and wire fraud designed to induce him to enter into [a] marketing agreement [under which he would sell real estate interests in the Longboat Bay Club, a real estate resort venture] plus allegations of extortion, threats and fraud in the administration of the marketing agreement. These events occurred over the course of a few months.

*Id.* at 566. In contrast, "[t]he second type of conduct . . . involves improprieties by defendants directed at others." *Id.* For example, the defendants allegedly solicited customers in Ohio to purchase interests in the Club even though their salespeople were not licensed and registered to do business in Ohio. Mail solicitations that were sent also allegedly failed to comply with Ohio state laws and regulations governing direct mail solicitation (*e.g.*, not including certain information and using improper terminology). In addition, there were alleged violations of Florida law because the real estate contracts used did not contain a mandatory ten-day cancellation provision. *See id.* at 563.

The Sixth Circuit held that the two types of conduct were not related for purposes of RICO. The court noted, for instance, the purpose underlying each kind of conduct. While the purpose of the first type of conduct was to induce the plaintiff to sign the marketing agreement and then force him out of the business, the purpose of the second type was different. For example, "[i]n the case of the direct mail solicitations, the defendants' purpose was to sell real estate interests to purchasers without the use of middlemen such as the plaintiff and to gain a marketing advantage with persons and entities beside plaintiff." *Id.* The court also took into consideration that the two types of conduct targeted different victims and had "disparate results": "The first line of activities [which was targeted at the plaintiff] resulted in the plaintiff's association with the defendants in a marketing agreement and the eventual demise of the business adventure," while the second line of activities, which was directed at ultimate purchasers, "resulted in unspecified individuals attending sales meetings and perhaps acquiring real estate interests in the Club . . . or

10

some other venture of defendants." *Id.*; *cf. Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (noting that "[t]he purpose, result, victim and method of the . . . misrepresentations [made to a packaging company] are strikingly different from the wire and mail fraud, stock manipulation and flat-fee advertising claims[;] [t]o hold that Plaintiffs have established relatedness solely because they implicate the same participants makes that requirement virtually meaningless.").

As the FAC currently stands, the Court finds that the allegations are insufficient to establish that the wire fraud and mail fraud are related acts. Plaintiffs suggest that the acts are related because, in both cases, Mercy's purpose was to make money. But this "common purpose" lacks sufficient specificity. *Cf. Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (in discussing an association-in-fact RICO enterprise, for which a plaintiff must plead there is a "common purpose," stating that "[a]n abstract common purpose, such as a generally shared interest in making money, will not suffice[;] [r]ather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct").

Plaintiffs also suggest that there was a common purpose "'to maximize profits [through] violation [of] legal obligations to Mercy's residents and physicians.'" Docket No. 19 (Pls.' Supp. Br. at 5) (quoting FAC ¶ 62). However, it is not even clear what Plaintiffs mean by this common purpose. And if anything, the apparent purpose of the wire fraud was to defraud the federal government of money, and the apparent purpose of the mail fraud was to retaliate against Dr. Sairam for his having made complaints. It is worth noting that the mail fraud did not seem to – at least not as alleged – yield any profit to Defendants. Even if patients chose to move to an attending physician other than Dr. Sairam, the ones who would profit would be the new attending physician. *Cf.* FAC ¶¶ 10-11 (suggesting that an attending physician is paid for his or her services by the patient).

According to Plaintiffs, the wire fraud and mail fraud are still related because "the wire fraud claims are actionable, in part, because Mercy is failing to disclose to the government violations Dr. Sairam reported to Mercy and violations of law regarding Dr. Sairam's patients'

11

right to choose him as their attending physician free of any interference from Mercy." Docket No. 19 (Pls. Supp. Br. at 5). But for predicate acts to be related for RICO purposes "require[s] more than [any] articulable factual nexus." *Heller*, 71 F.3d at 525. And to the extent Plaintiffs are suggesting that Defendants wanted to get rid of Dr. Sairam in order to continue making false claims for payment with the federal government, (1) there is no indication that Dr. Sairam was intending to expose Defendants' scheme to the federal government or that Defendants knew of such an intent, and (2) in any event, Defendants had *already* gotten rid of Dr. Sairam prior to the mail fraud by firing him as the Medical Director. The mail fraud did not appear to further the wire fraud. And although the mail fraud may have provided a factual context for the wire fraud, the victims of each differed and each involved entirely different kinds of conduct.

Accordingly, as the FAC is pled, the wire fraud and mail fraud are not related predicate acts for purposes of RICO. And because Plaintiffs have conceded that they suffered no injury as a result of the wire fraud, the RICO claim rests now on the mail fraud alone. The problem for Plaintiffs is that the mail fraud at issue here cannot serve as a predicate for the RICO claim because, even if each letter sent to each patient is a separate act (and those acts are related), RICO also requires that the predicate acts making up the pattern "amount to or pose a threat of *continued criminal activity*." *H.J.*, 492 U.S. at 239 (emphasis added).

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept – and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*Id.* at 241-42.

At the hearing, the Court explicitly asked Plaintiffs how the continuity requirement was satisfied with respect to mail fraud. In response, Plaintiffs noted that, in January 2021, Defendants

sent a letter informing patients or their representatives that Dr. Sairam was no longer the Medical Director at Mercy and suggesting (misleadingly) that he would no longer be an attending physician there either. *See* FAC ¶ 25; *see* also Opp'n at 15 (referring to this letter). Plaintiffs then stated that, thereafter, they sent a cease-and-desist letter demanding that Mercy stop unilaterally transferring patient care. *See* FAC ¶ 28. But in spite of the cease-and-desist letter, Defendants proceeded to send a second letter, in February 2021, to patients or their representatives, asking them to confirm whether they wanted to continue with Dr. Sairam as their attending physician and proposing a transfer to a different doctor (Dr. Dhugga). *See* FAC ¶ 29.

The conduct that Plaintiffs attribute to Defendants does not fall within either the open-ended concept or the closed-ended concept. The open-ended concept is inapplicable because the past conduct does not, by its nature, project into the future with a threat of repetition. There is no evident threat of continued repetition. As for the closed-ended concept, that requires repeated conduct, and two letters in the span of two months is insufficient. *See, e.g.*, *Turner v. Cook*, 362 F.3d 1219, 1230-31 (9th Cir. 2004) (taking note of plaintiffs' allegation that 94 companies received fraudulent communications from defendants in June or July 2001; "[b]ecause almost all of the alleged fraudulent communications occurred during the two month period between June and July of 2001, and the additional three categories of communication occurred only sporadically in the preceding year (and one of these communications was sent to one of the [plaintiffs]) appellants have failed to allege a 'series of related predicates extending over a substantial period of time'"); *Mocha Mill, Inc. v. Port of Mokha, Inc.*, No. 18-cv-02539-HSG, 2019 U.S. Dist. LEXIS 35218, at *30 (N.D. Cal. Mar. 5, 2019) (stating that, according to the Ninth Circuit, "activity spanning only a matter of months, involving a single victim, with a singular goal, cannot sustain a RICO claim").

Accordingly, the Court concludes that Plaintiffs have failed to state a RICO claim. The Court, however, shall give Plaintiffs an opportunity to amend the claim as it is not clear, at this point in the proceedings, that amendment would be futile.

As for Defendants' arguments on the claims that remain – all state law claims – the Court

13

does not, at this juncture, make any ruling.[3]  This is because, in the absence of a federal claim, the Court may decline supplemental jurisdiction under 28 U.S.C. § 1367(c).

### III. CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss.  Specifically, the Court dismisses the RICO claim but with leave to amend.

Plaintiffs shall have until thirty (30) days from the date of this order to file an amended complaint to address the deficiencies discussed above.  Any amendment must be made in good faith and in compliance with Federal Rule of Civil Procedure 11.  If Plaintiffs file an amended complaint, then Defendants shall have thirty (30) days thereafter to respond to the pleading.  (If Defendants moves to dismiss the new pleading, they may include any argument made in the present briefing that the Court did not address.)

If Plaintiffs do not intend to file an amended complaint, then, within thirty (30) days of the date of this, they shall file a statement with the Court, stating such.  The Court shall then decide whether to retain supplemental jurisdiction and, if it does, it will then address Defendants' arguments on the state law claims made in the present briefing.

This order disposes of Docket No. 8.

**IT IS SO ORDERED**.

Dated: September 14, 2021

_____
EDWARD M. CHEN
United States District Judge

---

[3] As noted above, Defendants primarily argue that Plaintiffs have failed to adequately allege Ms. Tsanos's participation in the alleged misconduct.