UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMIR SAIRAM, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>MERCY RETIREMENT AND CARE CENTER, et al.,<br><br>　　　　Defendants. | Case No. 21-cv-04335-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 30 |

　　　　Plaintiffs are Samir Sairam, a medical doctor, and an affiliated corporation known as Samir Sairam M.D. Inc. ("Sairam Inc."). Dr. Sairam previously worked at Mercy Retirement & Care Center ("Mercy"), a nursing facility. He served as its Medical Director and was also an attending physician for a number of its residents. Plaintiffs filed suit against Mercy and its Executive Director, Tamra Marie Tsanos, after Dr. Sairam was terminated as the Medical Director. Plaintiffs filed suit in state court, but Defendants removed because one of the claims that Plaintiffs asserted was a federal claim – specifically, a RICO claim.

　　　　Currently pending before the Court is Defendants' motion to dismiss the operative second amended complaint ("SAC"). The Court previously granted Defendants' motion to dismiss the first amended complaint ("FAC"), though, in that order, it addressed the merits of the RICO claim only. It declined to address the arguments made on the state law claims because, in the absence of a federal claim, the Court might decline supplemental jurisdiction. In the pending motion to dismiss the SAC, Defendants argue that the RICO claim, as replead, still is not viable. Defendants also argue that any claims asserted against Ms. Tsanos should be dismissed.

　　　　Having considered the parties' briefs, as well as the oral argument of counsel, the Court

1  hereby **GRANTS** the motion to dismiss the RICO claim.  Having dismissed the claim that served
2  as the basis for subject matter jurisdiction, the Court declines supplemental jurisdiction over the
3  remaining state law claims and remands the case back to state court.

### I. FACTUAL & PROCEDURAL BACKGROUND

A. SAC

In the SAC, Plaintiffs allege as follows.

Dr. Sairam is a licensed physician who specializes in geriatric medicine.  *See* SAC ¶ 2. Sairam Inc. is an affiliated company.  *See* SAC ¶ 3; *see also* SAC ¶ 11 (alleging that Dr. Sairam's services are billed through the corporation).  Mercy is a nursing facility.  *See* SAC ¶ 4.  Its Executive Director is Ms. Tsanos.  *See* SAC ¶ 5.

In 2017, Mercy hired Dr. Sairam to be its Medical Director.  *See* SAC ¶ 5.  As Medical Director, Dr. Sairam was "responsible for standards, coordination, surveillance, and planning for improvement of medical care at Mercy."  SAC ¶ 9.  In addition to being the Medical Director at Mercy, Dr. Sairam also acted as the attending physician for dozens of residents at Mercy.  *See* SAC ¶ 10.

In January 2021, Mercy notified Dr. Sairam that it would be terminating him as Medical Director, effective in March 2021.  Ms. Tsanos signed the termination notice.  In their initial disclosures, Defendants have confirmed that Ms. Tsanos was involved in making the decision to terminate.  *See* SAC ¶ 18.

"When Dr. Sairam asked Mercy why it was terminating his medical directorship, Mercy responded that one reason was Dr. Sairam was driving away other practitioners from the facility. Underlying Mercy's purported justification was Dr. Sairam's history of blowing the whistle on substandard care or fraudulent billing practices at the facility."  SAC ¶ 19; *see also* SAC ¶ 24 (alleging that "Mercy was fed up with Dr. Sairam's refusal to place patient well-being second to profits and administrative expediency").  For example, shortly before he was terminated, Dr. Sairam complained to Ms. Tsanos that substandard care had been provided to one of his patients because Mercy's administrator, Nicole Foreman, interfered with him instating a DNR order.  *See* SAC ¶¶ 13-17.  As another example, Dr. Sairam complained to Mercy on more than one occasion

2

that physicians performed medically unnecessary procedures on patients, "some of whom are incapacitated and cannot object to the treatment." SAC ¶ 21 (giving as examples an unnecessary skin biopsy and unnecessary wound debridements). He also complained about a doctor who would "send medical scribes (non-professional personnel who assist healthcare practitioners in charting physician-patient encounters in real time) to treat residents at Mercy" and who "would [then] bill Medicare as if he had personally performed the services charted by the medical scribe." SAC ¶ 20 (adding that "physicians with questionable billing practices don't want to practice in a facility where the medical director scrutinizes those practices").

Although Mercy was terminating Dr. Sairam, that did not "terminate his patient-physician relationships with residents at Mercy" SAC ¶ 25. He remained an attending physician for many residents. SAC ¶ 25. Defendants then began a "campaign to drive Dr. Sairam from Mercy completely, including by interfering with [his] patient-physician relationships with Mercy residents and by attempting to make [his] ability to treat those residents more difficult and burdensome." SAC ¶ 25.

As an example of interference, Mercy mailed a letter to residents or their authorized representatives a few weeks after issuing the termination notice in January 2021. In the letter, Mercy stated that Dr. Sairam was leaving as the Medical Director. The letter also gave the misleading impression that Dr. Sairam would no longer treat patients at Mercy as an attending physician – *e.g.*, by stating that he "'will be leaving us as of March 3, 2021'" and that Mercy "'greatly appreciate[s] his physician services these past years'" and "'wish[es] [him] well in his future endeavors.'" SAC ¶ 26. (This letter appears to have been signed by Ms. Tsanos. *See* SAC ¶ 26.) As another example of interference, in February 2021, Mercy asked Dr. Sairam to approve a proposed communication to his patients, "ask[ing] them to confirm whether they want to continue with Dr. Sairam as their attending physician." SAC ¶ 31. Dr. Sairam objected to the letter, but it was still mailed out which led to several of his patients leaving his care. *See* SAC ¶ 31.

As for an example of Defendants making it more difficult for Dr. Sairam to treat his patients, Mercy made policy changes – *e.g.*, barring email communication between practitioners

3

and community staff, including but not limited to patient care. *See* SAC ¶ 38. Also, Mercy ignored or delayed compliance with Dr. Sairam's patient care instructions, failed to inform him of suspected or confirmed COVID infections at the facility, and terminated his access to an online portal used to monitor COVID testing results. *See* SAC ¶¶ 39-42. Mercy further falsely cast aspersions on the quality of care provided by Dr. Sairam – *e.g.*, Mercy's counsel of record accused Dr. Sairam of not complying with COVID protocols.[1] *See* SAC ¶¶ 43, 46.

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of action.

(1) Intentional interference with contractual relationships (*i.e.*, between Plaintiffs and Mercy residents).

(2) Intentional interference with prospective economic advantage (*i.e.*, between Plaintiffs and Mercy residents).

(3) Violation of California Business & Professions Code § 510. *See generally* Cal. Bus. & Prof. Code § 510(c) (providing that it is a violation of public policy for a person or entity "to terminate an employment or other contractual relationship with or otherwise penalize a health care practitioner principally for advocating for appropriate health care").

(4) Violation of California Business & Professions Code § 2056. *See generally id.* § 2056(c) (providing the same with respect to a physician and surgeon; adding that "[n]o person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy, nor shall any person prohibit, restrict, or in any way discourage a physician and surgeon from communicating to a patient information in furtherance of medically appropriate health care").

(5) Violation of RICO. *See* 18 U.S.C. § 1962(c)-(d).

(6) Wrongful termination in violation of public policy (against Mercy only).

(7) Violation of California Business & Professions Code § 17200 (against Mercy

---

[1] In their reply brief, Defendants maintain that any communications made by Mercy's counsel of record are privileged under California Civil Code § 47. *See* Reply at 3.

only).

B.   Order on FAC re RICO Claim

As indicated above, Plaintiffs include in their SAC a claim for a violation of RICO. A RICO claim was also included in the prior FAC but the Court held that the claim, as pled, was deficient.

> Under § 1962(c), it is unlawful for a "person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Under § 1962(d), it is unlawful for a person to conspire to violate, e.g., subsection (c) above. *See id.* § 1962(d). "Racketeering activity" is defined to mean certain unlawful conduct, including but not limited to mail fraud (18 U.S.C. § 1341) and wire fraud (§ 1343). *See id.* § 1961(1). "Pattern of racketeering activity" means "at least two acts of racketeering activity . . . [,] the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Id.* § 1961(5).

Docket No. 25 (Order at 7) (footnote omitted).

The Court explained that, in the FAC, Plaintiffs identified two types of racketeering activity: "(1) Defendants mailed misleading letters to Dr. Sairam's patients (*i.e.*, mail fraud) and (2) Defendants 'submit[ed] claims for [false] payment to the federal government' (*i.e.*, wire fraud)." Docket No. 25 (Order at 7) (footnote omitted). Plaintiffs did not appear to be injured by the wire fraud in any way; rather, the victim of the wire fraud was the government. Plaintiffs did not dispute such but argued that they were still injured by the mail fraud and that was sufficient to have a viable RICO claim – *i.e.*, injury from one act of racketeering was good enough. However, the Court noted that

> Plaintiffs' position is viable only if the wire fraud and mail fraud can plausibly be considered part of [the same] *pattern* of racketeering activity. The Supreme Court has noted that, for there to be a pattern of racketeering activity, a plaintiff cannot rely solely on the fact that there is more than one predicate act.
>
> > In normal usage, the word "pattern" here would be taken to require more than just a multiplicity of racketeering predicates. A "pattern" is an "arrangement or order of things or activity, and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the

5

> relationship that they bear to each other or to some external organization principle that renders them "ordered" or "arranged."

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

Furthermore, the legislative history for RICO indicates that

> [a] pattern is not formed by "sporadic activity," and a person cannot "be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses."  Instead, "[t]he term 'pattern' itself requires the showing of a relationship" between the predicates, and of "'the threat of continuing activity.'"  "It is this factor of *continuity plus relationship* which combines to produce a pattern."  RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.

*Id.* at 239 (emphasis in original).

Docket No. 25 (Order at 8-9) (emphasis in original).

The Court determined that, based on the allegations made in the FAC, Plaintiffs failed to show that the wire fraud and the mail fraud were related.  "Predicate acts are related only if they have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Docket No. 25 (Order at 9) (internal quotation marks omitted).  According to Plaintiffs, the wire fraud and mail fraud were related because, "in both cases, Mercy's purpose was to make money," but the Court was not persuaded because

> this "common purpose" lacks sufficient specificity.  *Cf. Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (in discussing an association-in-fact RICO enterprise, for which a plaintiff must plead there is a "common purpose," stating that "[a]n abstract common purpose, such as a generally shared interest in making money, will not suffice[;] [r]ather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct").
>
> Plaintiffs also suggest that there was a common purpose "'to maximize profits [through] violation [of] legal obligations to Mercy's residents and physicians.'" Docket No. 19 (Pls.' Supp. Br. at 5) (quoting FAC ¶ 62).  However, it is not even clear what Plaintiffs mean by this common purpose.  And if anything, the

6

> apparent purpose of the wire fraud was to defraud the federal government of money, and the apparent purpose of the mail fraud was to retaliate against Dr. Sairam for his having made complaints. It is worth noting that the mail fraud did not seem to – at least not as alleged – yield any profit to Defendants. Even if patients chose to move to an attending physician other than Dr. Sairam, the ones who would profit would be the new attending physician. *Cf.* FAC ¶¶ 10-11 (suggesting that an attending physician is paid for his or her services by the patient).

Docket No. 25 (Order at 11).

Finally, the Court addressed Plaintiffs' contention that the wire and mail fraud were related

> because "the wire fraud claims are actionable, in part, because Mercy is failing to disclose to the government violations Dr. Sairam reported to Mercy and violations of law regarding Dr. Sairam's patients' right to choose him as their attending physician free of any interference from Mercy." Docket No. 19 (Pls. Supp. Br. at 5). But for predicate acts to be related for RICO purposes "require[s] more than [any] articulable factual nexus." *Heller*, 71 F.3d at 525. And to the extent Plaintiffs are suggesting that Defendants wanted to get rid of Dr. Sairam in order to continue making false claims for payment with the federal government, (1) there is no indication that Dr. Sairam was intending to expose Defendants' scheme to the federal government or that Defendants knew of such an intent, and (2) in any event, Defendants had already gotten rid of Dr. Sairam prior to the mail fraud by firing him as the Medical Director. The mail fraud did not appear to further the wire fraud. And although the mail fraud may have provided a factual context for the wire fraud, the victims of each differed and each involved entirely different kinds of conduct.

Docket No. 25 (Order at 11-12).

Because Plaintiffs failed to show that the wire and mail fraud were related, the Court was left with mail fraud as a possible basis for the RICO claim. Although Plaintiffs asserted more than one act of mail fraud (*i.e.*, an alleged pattern), the Court found that the continuity requirement had not been satisfied. *See* Docket No. 25 (Order at 12) (noting that continuity "'is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition'"). Plaintiffs had pointed to two letters sent by Defendants to his patients at Mercy – the first in January 2021 (where Defendants allegedly misled patients into thinking that, because Dr. Sairam would no longer be the Medical Director, he would also be leaving as an attending physician) and the second in February 2021 (where Defendants asked patients to confirm whether they wanted to continue with Dr. Sairam as

7

their attending physician). The Court noted that

> the conduct that Plaintiffs attribute to Defendants [as mail fraud] does not fall within either the open-ended concept or the closed-ended concept [of continuity]. The open-ended concept is inapplicable because the past conduct does not, by its nature, project into the future with a threat of repetition. There is no evident threat of continued repetition. As for the closed-ended concept, that requires repeated conduct, and two letters in the span of two months is insufficient. *See, e.g.*, *Turner v. Cook*, 362 F.3d 1219, 1230-31 (9th Cir. 2004) (taking note of plaintiffs' allegation that 94 companies received fraudulent communications from defendants in June or July 2001; "[b]ecause almost all of the alleged fraudulent communications occurred during the two month period between June and July of 2001, and the additional three categories of communication occurred only sporadically in the preceding year (and one of these communications was sent to one of the [plaintiffs]) appellants have failed to allege a 'series of related predicates extending over a substantial period of time'"); *Mocha Mill, Inc. v. Port of Mokha, Inc.*, No. 18-cv-02539-HSG, 2019 U.S. Dist. LEXIS 35218, at *30 (N.D. Cal. Mar. 5, 2019) (stating that, according to the Ninth Circuit, "activity spanning only a matter of months, involving a single victim, with a singular goal, cannot sustain a RICO claim").

Docket No. 25 (Order at 13).

Although the Court dismissed the RICO claim, it gave Plaintiffs an opportunity to amend.

C.  Allegations in Support of the RICO Claim in the SAC

In the SAC, Plaintiffs have reasserted a RICO claim. There are some new allegations but most are similar to those contained in the prior complaint. Below are the main allegations related to the RICO claim as pled in the SAC:

- Mercy and Ms. Tsanos participated in, or conspired to participate in, the conduct of an enterprise's affairs through a pattern of racketeering activity. *See* SAC ¶ 74.
- "The purpose of [the] enterprise is to maximize profits by submitting claims for payment to the government notwithstanding non-compliance with the laws and regulations governing the provision of health care services and the failure to provide medically appropriate care." SAC ¶ 74. *See, e.g.*, SAC at 18 n.2 (alleging that "'[e]ach CMS-2540-10 form submitted by Mercy [a form submitted by nursing facilities for Medicare purposes] certifies that Mercy's representatives are 'familiar with the laws and regulations regarding the provision of health care services, and that the service[s] identified in this cost report were provided in compliance with

8

such laws and regulations'"); *see also* Opp'n at 13 (indicating that Mercy was required to "disclose to the government violations reported by Dr. Sairam to Mercy").

- The pattern of racketeering activity includes the following acts: (1) "mailing letters (signed by Ms. Tsanos on behalf of Mercy) to all of Dr. Sairam's patients at Mercy to obtain money or property by means of false pretenses and representations about Dr. Sairam in violation of 18 U.S.C. § 1341" and (2) "submitting claims for payment to the federal government that, either expressly or implicitly, certify compliance with the laws and regulations regarding the provision of healthcare services, despite the pattern of legal violations outlined above, in violation of 18 U.S.C. § 1343." SAC ¶ 77.

- "Defendants terminated Dr. Sairam's medical directorship in retaliation for his objections to Mercy's noncompliant practices and because he presents an impediment to the pursuit of profit at the expense of medically appropriate care and compliance with the laws and regulations governing the provision of health care services. Because the termination of Dr. Sairam's medical directorship did not terminate his patient-physician relationships at Mercy, Defendants continue to take actions that interfere with those relationships and that otherwise burden and impede his ability to treat his patients, including by failing to timely carry out patient care orders, adopting policies and procedures that make his job more difficult or burdensome, maligning the quality of care he provides to his patients and his observance of COVID-19 precautions, and by misleading his patients (both by mail and orally). Defendants resorted to the numerous wrongful acts alleged herein, including through use of mail and wire communications, in order to silence him, discredit him, and/or drive him out of Mercy, and thereby protect its ability to continue submitting claims to the government while engaging in non-compliant practices." SAC ¶ 78.

Paragraph 78 seems to contain most of the new allegations related to the RICO claim.

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

In the instant case, Defendants contend that Plaintiffs' RICO claim is not plausibly pled. Defendants also challenge the claims asserted against Ms. Tsanos as implausible.

### B. RICO Claim

For the RICO claim, Plaintiffs have once again attempted to allege a pattern of racketeering activity based on mail fraud and wire fraud.

#### 1. Wire Fraud

As an initial matter, Defendants argue that it is implausible the mail and wire fraud are related (thus, creating a pattern of racketeering activity) because Plaintiffs have not, in the first instance, sufficiently alleged that Defendants engaged in wire fraud.

In response, Plaintiffs assert that the argument should be rejected because Defendants never made the argument in its first 12(b)(6) motion even though they could have. *See* Fed. R. Civ. P. 12(g)(2) (providing that, "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion"); Fed. R. Civ. P. 12(h)(2) (providing that "[f]ailure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial"). Plaintiffs also point out that the Court's order on the FAC allowed Defendants to include only arguments they made in the first 12(b)(6) motion. *See* Docket No. 25 (Order at 14) (stating that, "[i]f Defendants moves to dismiss the new pleading, they may include any argument made in the present briefing that the Court did not address"). Finally, Plaintiffs note that Mercy never moved to dismiss the RICO claim when asserted in the FAC (only Ms. Tsanos did) and instead answered it. *See* Docket No. 7 (answer). *But see* Docket No. 25 (Order at 7) (noting that, for the RICO claim, an argument was made that, "if accepted, would require dismissal as to not only Ms. Tsanos but also Mercy").

Although Plaintiffs' position is not entirely lacking in merit, the Court rejects it – particularly because, at the hearing, Plaintiffs themselves provided clarity for the first time as to what their wire fraud theory was. In any event, there is no real prejudice to Plaintiffs given that, even if the Court did not consider the argument here, nothing would bar Defendants from challenging the wire fraud claim through a 12(c) motion. To disregard Defendants' argument at this juncture would exalt form over substance.

According to Defendants, the wire fraud claim is not sufficiently pled because Plaintiffs allege in the SAC that *doctors* engaged in fraudulent billing practices with the government (implicitly for their own benefit), but there is no allegation that these doctors were Mercy *employees* such that it was ultimately Mercy who submitted false claims to the government. In other words, it was the individual doctors who were making false claims, and not Mercy. *See* Mot. at 14 n.4; *see also* Reply at 6 (maintaining that, "[b]ecause Mercy does not provide medical care above the level of skilled nursing, it would never submit bills to the government for doctors'

11

services"). Defendants raise a legitimate point. The SAC's allegations indicate that individual doctors billed residents for providing care as attending physicians, and not Mercy. *See, e.g.*, SAC ¶ 21 (alleging that Dr. Sairam spoke to the doctor who performed an unnecessary skin biopsy, the doctor "stated that it was *his company's* practice to biopsy all wounds") (emphasis added); SAC ¶ 20 (alleging that "*this physician* [who had a practice of sending medical scribes to perform medical services] would bill Medicare as if he had personally performed the services charted by the medical scribe") (emphasis added); SAC ¶ 20 (alleging that "*physicians* with questionable billing practices don't want to practice in a facility where the medical director scrutinizes those practices") (emphasis added); *cf.* SAC ¶ 11 (alleging that Sairam Inc. – *i.e.*, not Mercy – bills for services provided to the residents when Dr. Sairam is acting as an attending physician).

Plaintiffs protest that, regardless of what individual doctors may have done, they have still alleged that *Mercy itself* also submitted false claims to the government. *See* Opp'n at 21 & n.5 (stating that, "[t]o be clear, both physicians at Mercy and Mercy submit claims for reimbursement to the federal government, physicians for professional services and Mercy as a skilled nursing facility"; citing 42 U.S.C. § 1395yy which relates to payments to skilled nursing facilities). For example, in ¶ 77 of the SAC, Plaintiffs allege that Defendants "submit[ted] claims for payment to the federal government that, either expressly or implicitly, certifying compliance with the laws and regulations regarding the provision of healthcare services, despite the pattern of legal violations outlined above." SAC ¶ 77; *see also* SAC at 18 n.2 (alleging that "'[e]ach CMS-2540-10 form submitted by Mercy [a form submitted by nursing facilities for Medicare purposes] certifies that Mercy's representatives are 'familiar with the laws and regulations regarding the provision of health care services, and that the service[s] identified in this cost report were provided in compliance with such laws and regulations'"). While this is true, the allegation that Mercy submitted false claims is somewhat conclusory in nature. Certainly, it is muddled: what exactly was false about the claims that Mercy was making for payment for its services (as a nursing facility)?

When pressed at the hearing, Plaintiffs provided clarification. According to Plaintiffs, Mercy submitted false claims for payment to the government not for the false billings which had

12

been the focus of Plaintiffs' FAC and SAC, but because Mercy represented in its submittals that it was in compliance with health care law when, in fact, it had violated such law by penalizing Dr. Sairam for advocating for appropriate health care (in contravention of California Business & Professions Code §§ 510 and 2056). The problem for Plaintiffs is that they have failed to allege how this falsity was material. In addressing the False Claims Act, the Supreme Court has noted that "statutory, regulatory, and contractual requirements are not automatically material, *even if they are labeled conditions of payment*." *Univ. Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016) (emphasis added). In addition, in *Escobar*, the Supreme Court rejected the view that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 195. The Court explained as follows:

> [According to the Government,] [i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act. To the Government, liability would attach if the defendant's use of foreign staplers would entitle the Government not to pay the claim in whole or part – irrespective of whether the Government routinely pays claims despite knowing that foreign staplers were used. Likewise, if the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability.

*Id.* at 195-96.

*Escobar* provides guidance in the instant case. Under Plaintiffs' position, because Mercy terminated him for advocating for appropriate health care, it violated health care law, and therefore all requests for payment that Mercy thereafter made (certifying that it was in compliance with health care law) were false, regardless of whether a given request for payment had any connection to the advocacy in which he engaged. This is the kind of expansive *ipse dixit* alleged violation that fails to regard the basic requisite of materiality condemned in *Escobar*. Plaintiffs must articulate a basis for how the alleged falsity was material in order to have a viable wire fraud claim. They have not done so.

Accordingly, the Court agrees with Defendants that Plaintiffs have failed to adequately allege a claim for wire fraud based on false claims for payment submitted to the federal government.

        2.        <u>Whether Wire Fraud and Mail Fraud Are Plausibly Related</u>

Even assuming that Plaintiffs adequately pled a claim for wire fraud (based on false certification of law compliance made in claims for payment submitted to the federal government), Plaintiffs must adequately plead a *pattern* of racketeering activity to state a RICO claim. Although Plaintiffs assert that there is a pattern based of racketeering activity based on wire fraud and mail fraud,[2] they have not plausibly alleged that the wire fraud and mail fraud are related for purposes of RICO.

As noted in the Court's prior order, for there to be a pattern of racketeering activity, the predicate acts must be related and have continuity. Though the relatedness requirement is not a cumbersome one, it "is not without any bite. Predicate acts are related only if they have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Docket No. 25 (Order at 9) (internal quotation marks omitted; citing *H.J. Inc. v Nw. Bell Tel. Co.*, 492 U.S. 299, 240 (1989)).

In the instant case, Plaintiffs have alleged that the purpose of the RICO enterprise was "to maximize profits by submitting claims for payment to the government notwithstanding non-compliance with the laws and regulations governing the provision of health care services and the failure to provide medically appropriate care." SAC ¶ 74. According to Plaintiffs, both the wire fraud and the mail fraud shared this purpose. *See* Opp'n at 11 (asserting that the "unifying purpose" is "to maximize profits by submitting claims for payment to the government, notwithstanding non-compliance with the laws and regulations governing the provision of health care services and the failure to provide medically appropriate care"); Opp'n at 12 (claiming that the "common purpose" is "to facilitate Mercy's submission of claims to the government

---

[2] The Court acknowledges Plaintiffs' position that the mail fraud component is actually made up of mail fraud *and* email fraud (with the latter technically being wire fraud).

14

notwithstanding its non-compliant practices").

The wire fraud, as pled, would arguably have the above-identified purpose. The wire fraud is Defendants' act of submitting false claims for payment to the government. But, as the Court previously noted, it is not at all clear how the mail fraud has the same purpose. The mail fraud consisted of, *e.g.*, Defendants sending letters to Dr. Sairam's patients suggesting that he would no longer be providing services as an attending physician and/or that the patients should move over to a new attending physician. As the Court previously noted, the "apparent purpose of the mail fraud was to retaliate against Dr. Sairam for his having made complaints" about, *e.g.*, the fraudulent billing practices by doctors, and the mail fraud did not yield any profit to Defendants – *i.e.*, "[e]ven if patients chose to move to an attending physician other than Dr. Sairam, the ones who would profit would be the new attending physician," not Mercy. Docket No. 25 (Order at 11).

Plaintiffs suggest that, while retaliation may have been one purpose for the mail fraud, that does not mean that the mail fraud did not have another purpose as well – *i.e.*, protecting the scheme to defraud the government. *See* Opp'n at 9 (arguing that it is not proper to "narrow[] the 'purpose' behind an action to its most immediate result"; nor is it proper to "assume[] that an act may serve only one purpose at a time"). Although mail fraud could in theory have had more than one purpose, it is not plausible that the mail fraud had the additional purpose of protecting the scheme to defraud the government which involved lying about the very letters about which Plaintiffs complain. There is an inherent illogic in Plaintiffs' circular reasoning: Defendants engaged in unlawful conduct (removing Dr. Sairam) in order to prevent the disclosure of that very conduct.[3]

Moreover, Plaintiffs have not explained with any specificity *how* ousting Dr. Sairam from Mercy furthered Mercy's scheme to defraud the government. That is, how would removing Dr. Sairam as an attending physician further Mercy's ability to lie to the government about its compliance with health care law? Mercy had already terminated Dr. Sairam from his position as

---

[3] There appears to be a more fundamental problem with Plaintiffs' basic racketeering pattern theory. Under Plaintiffs' logic, any time an applicant engages in an unlawful retaliatory act allegedly, but does not disclose it in a certification for payment by a federal agency, it arguably commits a RICO violation. It is by no means evident that this is a result intended by Congress.

1    Medical Director because (as alleged) he had advocated for appropriate health care. The direct

2    and primary act of retaliation was consummated. Having suffered that retaliatory termination, Dr.

3    Sairam was already incentivized to blow the whistle. Indeed, any effort to terminate his

4    relationships with patients as attending physician (thereby creating more legal violations) would

5    only serve to further incentivize Dr. Sairam to blow the whistle. Accordingly, Plaintiffs have

6    failed to allege a plausible claim that the mail and wire fraud are related.

        3.      Continuity of Mail Fraud

Although the Court finds it implausible that the wire fraud and mail fraud are related, there is still one remaining issue for the Court to consider – *i.e.*, whether, considering the acts of mail fraud alone, there is a pattern of racketeering activity. As noted above, the Court previously held that, though Plaintiffs asserted more than one act of mail fraud (*i.e.*, an alleged pattern), the continuity requirement had not been satisfied. Even when the new allegations in the SAC are considered, Plaintiffs have not alleged enough to show a pattern of racketeering activity. Although Plaintiffs have alleged "an *ongoing* campaign to oust Dr. Sairam, using mail and [email] communications," Opp'n at 17 (emphasis in original), which suggests continuity, there must be still be a *fraudulent scheme* in the first instance for which Defendants were using the mail and/or email.[4]  *See Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (stating that "[m]ail fraud . . . occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do'[;] [t]he gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element'"); *see also Schmuck v. United States*, 489 U.S. 705, 711, 715 (1989) (stating that the mail fraud statute reaches "instances in which the

---

[4] In their reply brief, Defendants argue for the first time that any email communications are not wire fraud because there is no allegation of a connection to interstate commerce – *e.g.*, that the "emails originated from individuals or entities located in different states from one another" or that the "computer servers hosting the originating and/or receiving emails were based on different states when [the] communications were sent"). *See* Reply at 8-9. *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004) (noting that, "[a]s a matter of substance, it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state"), *rev'd on other grounds*, 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). For purposes of this motion, the Court need not address this issue.

1  use of the mails is a part of the execution of the fraud"; adding that even "'innocent' mailings –
2  ones that contain no false information – may supply the mailing element").
3        Here, Plaintiffs are still relying on an alleged scheme to defraud the government – *i.e.*,
4  ousting Plaintiffs would permit Defendants to "continue to submit false claims." Opp'n at 18. For
5  the reasons stated above, it is not plausible that ousting Plaintiffs would serve to permit
6  Defendants to continue making false claims for payment to the government. Thus, even if
7  Plaintiffs have pled continuity of bad conduct by Defendants, that in and of itself is not sufficient
8  as Plaintiffs must allege that such continuous conduct was in furtherance of a *scheme to defraud*.
9  They fail to do so.

### III.    CONCLUSION

11        For the foregoing reasons, the Court dismisses the RICO claim for failure to state a claim
12  for relief. Plaintiffs' RICO claim as pled in the SAC is still deficient: (1) the predicate act of wire
13  fraud is not plausibly alleged because Plaintiffs have not plausibly alleged how Mercy's false
14  certification of compliance with health care law was material; (2) even if the predicate act of wire
15  fraud were plausibly alleged, Plaintiffs have failed to plausibly allege that the wire fraud and mail
16  fraud were related (*i.e.*, that there was a pattern of racketeering activity); and (3) to the extent
17  Plaintiffs claim a pattern of racketeering activity based on the various acts of mail fraud and/or
18  email fraud (designed to oust Dr. Sairam from Mercy as even an attending physician), Plaintiffs
19  have not alleged a plausible scheme to defraud sufficient to state a RICO claim.
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

17

Because the Court previously gave Plaintiffs an opportunity to remedy the RICO claim and they have still failed to do so, the dismissal of the RICO claim is with prejudice. The Court declines to exercise supplemental jurisdiction over the remaining state law claims (including those brought against Ms. Tsanos) and therefore does not address any of Defendants' arguments on the state law claims. Because the instant case was removed to federal court, the Court orders the Clerk of the Court to remand the case back to the Alameda County Superior Court. In addition, the Clerk is ordered to close the file in this case.

This order disposes of Docket No. 30.

**IT IS SO ORDERED**.

Dated: January 19, 2022

_____
EDWARD M. CHEN
United States District Judge