**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| SAMIR SAIRAM, M.D., an individual; SAMIR SAIRAM, M.D., INC., a California professional corporation;<br><br>        Plaintiffs,<br><br>  VS.<br><br>MERCY RETIREMENT AND CARE CENTER, a California corporation; TAMRA MARIE TSANOS, an individual,<br><br>        Defendants. | No. C 21-4335 EMC<br><br><br><br>San Francisco, California<br>Thursday, January 13, 2022 |

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES**:   (via Zoom Webinar)

For Plaintiffs:         KESSENICK, GAMMA & FREE, LLP
                        1 Post Street, Suite 2500
                        San Francisco, California 94104
                  **BY:  MICHAEL A. GAWLEY, ESQ.**

For Defendants:         ERICKSEN ARBUTHNOT
                        210 North Fourth Street, Suite 350
                        San Jose, California 95112
                  **BY:  LAURA E. MALKOFSKY, ESQ.**




Reported By:    Katherine Powell Sullivan, CSR #5812, CRR, RMR
                Official Reporter - U.S. District Court

| | |
|---|---|
| 1 | **Thursday - January 13, 2022**                    **1:31 p.m.** |

2          **P R O C E E D I N G S**

3                   ---oOo---

4          **THE CLERK:** Calling Samir Sairam, et al. versus Mercy

5   Retirement and Care Center, et al., case number 21-4335.

6      Counsel please state your appearance.

7          **MR. GAWLEY:** Thank you. My name is Michael Gawley,

8   G-A-W-L-E-Y, and I'm an attorney for the plaintiffs in the

9   Sairam versus Mercy litigation.

10         **THE COURT:** All right. Thank you, Mr. Gawley.

11         **MS. MALKOFSKY:** And Good afternoon, Your Honor. My

12  name is Laura Malkofsky, and I am attorney for defendants Mercy

13  Retirement Care Center and Ms. Marie -- sorry, Tamra Marie

14  Tsanos.

15         **THE COURT:** All right. Thank you, Ms. Malkofsky.

16      Let me ask you, Mr. Gawley, I issued a prior ruling on

17  RICO. What's different with this new amended complaint that

18  you think materially changes the analysis here?

19         **MR. GAWLEY:** Well, I think we've added allegations to

20  clarify both the relatedness of the predicate acts, we've

21  alleged additional predicate acts, and we've also clarified why

22  we believe there's continuity.

23      We've also addressed the issues raised in the Court's

24  prior ruling on the motion to dismiss and clarified why we

25  think we've stated an adequate claim.

1    **THE COURT:**  Well, let's talk about the pattern of
2    racketeering activity and the plausibly related.
3        I guess I have trouble seeing how the host termination
4    letters, the interference, the falsities, the alleged falsities
5    that disrupted the relationship with Dr. Sairam and the
6    patients, which was after the fact, that is after his
7    termination, how is that related to -- how does that further
8    the scheme of obtaining money from the federal government?
9        **MR. GAWLEY:**  Yes, and I think this is a really crucial
10   distinction from the prior cases where there's been a
11   whistleblower who's then terminated and brings a RICO claim.
12       Here, Dr. Sairam wore two hats.  He was a medical
13   director -- and that's what Mercy terminated, essentially, his
14   administration functions -- but he is also an attending
15   physician for patients at Mercy.  And he is still treating
16   patients at Mercy and has continued to do so even after they
17   terminated his medical directorship.
18       So one way they are trying to push Dr. Sairam out was the
19   termination of his medical directorship.  The ongoing pattern
20   of trying to push him out and using wire and mail to do that is
21   part and parcel of their scheme.
22       So we don't have a situation where his relationship with
23   the entity is totally cut off; it's still ongoing.  And, in
24   fact, many of his patients that initially left after the first
25   instance of Mercy interference have come back to him, and sort

1  of further creating more facts to show that he's going to be
2  there and he's still there, and that's why their ongoing effort
3  after the termination of the medical directorship is important.
4  **THE COURT:** But what ability does he have to thwart
5  this -- this fraudulent medical billing, if he's no longer the
6  medical director and he is an attending physician, and the fact
7  that he had already, you know, I mean, didn't it -- now that
8  he's been terminated from the directorship, not only does he --
9  I'm not even sure what access he has to billing practices and
10 this sort of thing.
11     And so what threat is he as an attending physician and not
12 as a medical director?
13     **MR. GAWLEY:** His threat is his insistence on
14 compliance with healthcare regulations and law and his
15 insistence that Mercy does so as well.
16     He can do that as an attending physician for his patients.
17 And he can, you know, advocate.  He can't control policy as he
18 could when he was a medical director, but he can advocate and
19 make Mercy on notice that they have to comply with those laws
20 which are more onerous and more expensive.
21     **THE COURT:** All right.  Do you have a response to
22 that, Ms. Malkofsky?
23     **MS. MALKOFSKY:** I do, Your Honor.  Thank you.
24      First of all, just as a side note, it appears that
25 Mr. Gawley has acknowledged that Dr. Sairam has increased his

1  patients, apparently, that are now at Mercy.  So if, indeed,
2  there was an alleged RICO that's attempting to terminate his
3  presence entirely from Mercy, apparently we were very
4  unsuccessful at that.
5      But the main point here is that although these arguments
6  were tweaked between the First Amended Complaint and the Second
7  Amended Complaint, the facts were not.
8      There are no new facts, because there aren't any that
9  exist, as to what exactly Mercy, the defendant, as opposed to
10 any individuals who are also practitioners who have patients at
11 Mercy, allegedly did with respect to fraudulent billing.
12     There is simply not a single fact in the Second Amended
13 Complaint that states that Mercy submitted false billing to the
14 federal government and that it's continuing to do so.  It's
15 just a vehicle that is being argued now to rationalize this
16 RICO cause of action which, in turn, is simply being alleged
17 for the purpose of seeking treble damages.
18     This is a wrongful termination case, allegedly, and that's
19 it.  And the creation of this, quote-unquote, RICO activity
20 while is described in vague conclusory terms in the allegations
21 of the Second Amended Complaint, there are no facts supporting
22 it.  And that is what the Court needs to look at when it's
23 evaluating the adequacy of the Second Amended Complaint.
24          **THE COURT:**  You've raised a slightly different
25 question, and that is whether there is any fraud by Mercy as

1    opposed to physicians, which I want to get to in a second.
2        But assuming there is some claim of Mercy's involvement or
3    profiting from this, what's your response to the argument that,
4    well -- my prior ruling that, well, there's no nexus between
5    the letters that went out to the patients and the underlying
6    fraud against the Government, they're two different things, and
7    there's no evidence that the latter or that the letters to the
8    patients was meant to further the scheme or the coverup?
9        Because, you know, he had already been terminated at that
10   point.  And then the comeback is, well, he hadn't been
11   completely terminated, and as an attending physician he is
12   still in a position to advocate, and by driving him out
13   completely they could get rid of this potential threat.
14       **MS. MALKOFSKY:**  Well, Your Honor, for one thing,
15   there's not letters plural.  There is one letter that went out,
16   that asked the patients of Dr. Sairam, who reside at Mercy,
17   whether or not they wanted to continue working with him or not.
18   That's it.
19       Then the other allegations, if you even want to call them
20   that, are again just these vague conclusory allegations that
21   reported things to Mercy, to these unidentified people, and
22   even after he was terminated, and that nothing was done about
23   it.
24       Again, it's just a rationalization.  There is no scheme
25   that has been factually alleged to even have occurred.

| | |
|---|---|
| 1 | **THE COURT:** All right. Well, let me ask, Mr. Gawley, |
| 2 | I mean, if your theory, your enhanced theory or new theory |
| 3 | that, well, there was still an attempt to squelch his |
| 4 | whistleblowing, but all we have is -- whether it's one letter |
| 5 | or two letters, they are close in time, there's no allegation |
| 6 | of anything else that was done to try to continue to squelch |
| 7 | him and to stop the whistleblowing.  Nor is there any |
| 8 | allegation that he attempted to do any more whistleblowing |
| 9 | after this letter went out, right, these letters, one or two |
| 10 | letters went out to the patients. |
| 11 | **MR. GAWLEY:** That's not quite true, Your Honor. |
| 12 | The Second Amended Complaint alleges a letter to patients |
| 13 | in January of 2021 that says Dr. Sairam is no longer the |
| 14 | medical director and misleading patients into thinking he can't |
| 15 | provide their care as an attending physician. |
| 16 | They sent an email to Dr. Sairam on February 2nd telling |
| 17 | him they're going to transfer his patients. |
| 18 | They sent an email to him on February 9th telling him, |
| 19 | again, they were going to transfer his patients. |
| 20 | On February 11th they threatened to bar him from the |
| 21 | premises by email. |
| 22 | In February they sent another letter to patients |
| 23 | misleadingly saying that they had to choose between Dr. Sairam |
| 24 | and Dr. Dhugga. |
| 25 | In June of 2021, they emailed Dr. Sairam about a new |

1  policy permitting the medical director to reassign his
2  patients, for which he was the attending physician.
3      On June 4th they sent another email telling Dr. Sairam
4  that he can no longer submit orders for his patients by email.
5  They sent that to him by email.
6      And on September 23rd, 2021, they sent Dr. Sairam another
7  letter claiming that he failed to comply with COVID-19
8  protocols and threatening to bar him from the facility.
9      We then filed the amended complaint in early October.
10 This is a consistent pattern of them trying to push him out and
11 using wire and mail to do so.
12     And in terms of Mercy's billing, the allegations for their
13 billing, I'm happy to address that if the Court --
14     **THE COURT:**  Well, emails to him are not allegedly
15 fraudulent.  The two fraudulent emails are the communication to
16 the patients.
17     **MR. GAWLEY:**  Well, not quite, Your Honor.  In order to
18 be actionable for mail or wire fraud, it simply has to be an
19 email or wire in furtherance of the scheme.  The actual content
20 of the communication itself need not be fraudulent and you need
21 not rely on it.  But so long as you use mail or wire to further
22 a fraudulent scheme, which we've alleged, that satisfies the
23 mail/wire fraud statute.
24     **THE COURT:**  Well, and your theory is this was all done
25 to squelch him from making any more statements or from making

1   any statements or whistleblowing?
2        **MR. GAWLEY:**  It's to get him out of the facility to
3   enable Mercy to continue its pattern and practice of billing
4   the Government while not complying with healthcare regulations.
5        **THE COURT:**  What evidence is there of continuing --
6   during this saga, starting after his termination in January up
7   through these various letters and emails, what allegation is
8   there of continuing fraud by Mercy --
9        **MR. GAWLEY:**  Well, the fraud, the predicate fraud is
10  the failure to comply with applicable healthcare regulations.
11  And here it's the California and federal regulations permitting
12  patients to select their attending physicians and giving
13  attending physicians the right to treat their patients free
14  from interference from the facility.
15       **THE COURT:**  So it's no longer the fraud of making
16  false billings --
17       **MR. GAWLEY:**  No.
18       **THE COURT:**  -- but the representation that they're not
19  complying with regs by interfering with Dr. Sairam's
20  relationship with his clients?
21       **MR. GAWLEY:**  That is the false billing.  And I think
22  that's the key here.  And that is where I think referring to
23  paragraph 77 of the complaint in the footnote that really sort
24  of explains this and sets this out in detail.
25          As a condition of payment, Mercy, as a skilled nursing

1  facility, has to complete every year and submit electronically
2  a CMS Form 2540-10.  This says that Mercy certifies that their
3  representatives are familiar with all of the laws and
4  regulations governing the provision of healthcare services and
5  that all the services therein are provided in compliance with
6  those laws.
7      Their interference with Dr. Sairam is a violation of
8  applicable laws for the provision of healthcare services.  By
9  them submitting this form to the Government, they are
10 submitting a false claim that is actionable under the wire
11 fraud statute through this RICO.
12     **THE COURT:**  So every noncompliance, not just
13 submitting for false billings but anytime you certify, isn't
14 there -- that gets us in a whole area of case law, this whole
15 certification question whether that constitutes wire fraud or
16 not, because that's such a broad theory.
17     Because it's very common to say, I certify -- anytime you
18 get any kind of federal funds you say, I'm complying with the
19 law.  Well, you might be violating a Labor Code provision, an
20 hourly thing.  You might be violating some environmental
21 technical thing.  It's not so clear to me that that's wire
22 fraud.
23     **MR. GAWLEY:**  Yes.  I think what distinguishes our case
24 from the line of cases that says sort of unknown, you know,
25 small technical violations aren't going to constitute wire

1  fraud is, here, in February we put Mercy on notice that:
2  You're interfering with Dr. Sairam's right to treat patients,
3  and you're certifying to the federal government that you're
4  complying with these laws.  So stop interfering because that
5  puts you out of compliance.
6      They continued to interfere pretty regularly from when
7  Dr. Sairam was terminated as medical director up through the
8  filing of the Second Amended Complaint.
9          **THE COURT:**  So your theory is that the -- is it wire
10 fraud or mail fraud?  The mail fraud is the certification
11 problem to the federal government not -- not the billing
12 practices of the doctors; is that right?
13         **MR. GAWLEY:**  Correct.
14         **THE COURT:**  All right.  What's your response to that,
15 Ms. Malkofsky?
16         **MS. MALKOFSKY:**  Your Honor, first of all, that
17 argument was not even raised in the opposition papers.  The
18 opposition papers continuously talk about the fraudulent
19 billing practices, and that's all that it focuses on.
20      Secondly, half of -- at least half of the emails and
21 letters that counsel just referred to, that took place between
22 Dr. Sairam's termination and the filing of the Second Amended
23 Complaint, were adopted by attorneys for both parties.
24      And that is actually set forth very distinctly in the
25 complaint that it was -- there's every single email or letter

1  that was sent by counsel.  It actually says in parentheses
2  "sent by counsel."
3      So I don't understand how Mercy can be held responsible
4  for letters and emails that its counsel are drafting and
5  sending.
6      Secondly, this paragraph 77 that counsel refers to, that
7  was in the First Amended Complaint.  So Your Honor didn't find
8  it to have supported the RICO cause of action in the First
9  Amended Complaint.  It's not a change in the Second Amended
10 Complaint.  That was there before.
11     So it kind of boggles the mind that all of a sudden we're
12 changing theories again and it's not fraudulent billing by the
13 practitioners but now it's this one certification that is now
14 the center of the RICO activity when it was barely mentioned
15 previously.
16         **THE COURT:**  Mr. Gawley, tell me where in your
17 opposition you allege that the -- that the wire fraud is the
18 certification.  Where in the complaint.
19         **MR. GAWLEY:**  In the complaint?
20         **THE COURT:**  Yeah.
21         **MR. GAWLEY:**  In paragraph 77, which is on page 18.
22         **THE COURT:**  And that's it?  Just paragraph 77?  Is it
23 that you're hinging everything on paragraph 77?
24         **MR. GAWLEY:**  And footnote 2, yes.
25         **THE COURT:**  Well, isn't that -- so that is a major

1  shift from your theory.

2  **MR. GAWLEY:**  No, Your Honor.

3  **THE COURT:**  Certainly from your original theory, isn't
4  it?

5  **MR. GAWLEY:**  No, Your Honor.

6  Our original theory -- so there's two things to remember.
7  When Dr. Sairam reports that physicians are overcharging, and
8  he tells Mercy that, that's not imputing the physician's false
9  claim to Mercy.  That's putting Mercy on notice that they have
10 physicians there who are not following the billing guidelines.

11 That's not the false claim that we based our First Amended
12 Complaint on or the original complaint.  Our theory has always
13 been that there is a certification that Mercy has to make to
14 the federal government that it complies with applicable law,
15 and that they have not done so.  The primary violation here is
16 their failure to honor the rules that govern the relationship
17 between patients and physicians.

18 It didn't come up in prior briefing because this argument
19 that Mercy made in this new motion to dismiss, that we don't
20 even allege that they filed a false claim with the Government,
21 that's new.  That's why it hasn't been discussed before now --

22 **THE COURT:**  So your theory is that the violation is,
23 number one, they interfered improperly with patient-physician
24 relationship to the detriment of Dr. Sairam; two, they
25 certified it falsely to the Government.

1       **MR. GAWLEY:**  Yeah.

2       **THE COURT:**  It actually doesn't matter whether there
3  were fraudulent billing, inflated billing practices,
4  unnecessary medical, all that's just really -- it's not
5  necessary to this case; right?

6       **MR. GAWLEY:**  Well, it's not necessary to the RICO
7  action.  And this is why it's not a False Claims Act case.

8       **MS. MALKOFSKY:**  May I interject a question?

9       **THE COURT:**  Sure.

10      **MS. MALKOFSKY:**  I don't even understand -- the --
11 plaintiff is not alleging that Mercy was the one submitting the
12 fraudulent billing.

13      How would it be Mercy's responsibility to be reporting
14 something related to private practitioners doing their own
15 billing, just as Dr. Sairam admits in his complaint he does his
16 own billing through his corporation?

17      So how Mercy is even involved in that aspect of this
18 paragraph 77 allegation, which again was part of the original
19 complaint, it's just -- it's not new.  It's not specified as
20 interstate wire fraud, by the way.  We haven't reached that
21 discussion yet.  But the allegations with respect to
22 specificity of interstate wire fraud are absent from the Second
23 Amended Complaint as well.

24      But Mercy's responsibility -- I mean, there's no
25 allegations that Mercy is responsible for reporting what every

1   one of its individual practitioners that might walk into its
2   doors to treat one of its patients is doing.  It can't possibly
3   be responsible for dealing with other people's individual
4   billing practices.
5         **THE COURT:**  As I understand, the theory is that to the
6   extent that Mercy submitted claims for payment to it -- and
7   this is different from the doctors' claims for inflated
8   services -- even if it's for some whatever, some reimbursement
9   or whatever it is that it gets reimbursed -- and I take it
10  there's an allegation that Mercy did submit claims on its own,
11  not in connection with these medical services that were
12  inflated; correct?
13        **MR. GAWLEY:**  Correct.
14        **THE COURT:**  And that that -- and sort of any
15  submission of paying for a payment, even if it's not the
16  doctors' services that were allegedly fraudulent, contain a
17  certification that, "We comply with all laws and regulations,"
18  and to the extent they didn't comply with all laws and
19  regulations and knew it, that's the fraud.  That's the theory;
20  right, Mr. Gawley?
21        **MR. GAWLEY:**  Correct.
22        **MS. MALKOFSKY:**  But the Second Amended Complaint is
23  absent of facts supporting that, quote-unquote, theory.
24        **THE COURT:**  Well --
25        **MS. MALKOFSKY:**  There's not a mention of a single

1  specific fact supporting that theory.

2  **THE COURT:** I'll let you respond to that, then I'm
3  going to conclude this hearing, Mr. Gawley.

4  So I've got 77 that provides the legal framework, although
5  in a somewhat indirect way. Where's the allegation, number
6  one, of payments to Mercy and, two, facts that show
7  noncompliance with, quote, the laws and regulations regarding
8  healthcare services?

9  **MR. GAWLEY:** Yes. So in terms of Mercy's submission
10 of claims to the federal government and receiving payment, that
11 again is in paragraph 77, that Mercy submitted claims for
12 payment to the federal government despite patterns of legal
13 violations.

14 If the Court needs clarity and wants us to add a paragraph
15 or facts that Mercy is a skilled nursing facility that bills
16 Medicare, and it gets paid by the per patient per day, we're
17 happy to do that. And I don't think Mercy can get around those
18 allegations. That's a clarity that we can provide that I think
19 is not controversial.

20 In terms of the pattern of legal violations, the factual
21 predicates are in the body of the complaint. But, actually, if
22 you go down to the UCL cause of action on -- starting on page
23 20, there's a list of unlawful actions, the specific laws that
24 they violated, including the retaliation by terminating him
25 from medical directorship, overriding his medical

1   decision-making authority, interfering with the residents'
2   right to choose their attending physician, failing to ensure
3   that all Dr. Sairam's orders are lawfully submitted and carried
4   out.
5       And what makes this different from the -- the body of case
6   law that says maybe not every little violation is wire fraud,
7   Mercy was put on notice for each one of these, and it continued
8   to try to push Dr. Sairam out.
9       So this is not an unknowing system of certifying
10  compliance.  This is them violating and knowingly violating
11  these laws and continuing to violate them and at the same time
12  certifying compliance with them to the federal government.
13      And I want to note that these are not tiny provisions in
14  the law.  A patient's right to choose their physician is not
15  just a common law right, but it's included in what is called
16  the skilled nursing facility Patient Bill of Rights.  It's an
17  important aspect of their rights as a patient at Mercy --
18      **THE COURT:**  Let me ask you one last question,
19  Mr. Gawley.  What's your strongest case authority that holds
20  that violation of law and then certifying, contrary to those
21  violations of law, that you're complying with the law and
22  getting payment constitutes a kind of pattern of racketeering
23  that is RICO?
24      Because they're intimately related.  You're saying once
25  you do something and then you certify that you're not doing

1  something, even though it's kind of the two sides of the same
2  coin, you're saying that's a pattern of racketeering.  What's
3  the best case for that?
4          **MR. GAWLEY:**  I was just looking at it.  One moment.
5  Apologies while I pull it up.
6      So I think the *Ikuno* case is a good case.  It's 912 --
7          **THE COURT:**  Is this cited in your brief?
8          **MR. GAWLEY:**  Yes, it is.  *Ikuno v. Yip*.  I-K-U-N-O
9  versus Y-I-P.  And the idea is they're filing false annual
10 reports.  And there's no indication that it will stop, and so
11 they found that there's an adequate RICO violation there.
12         **THE COURT:**  Does that address continuity or does that
13 address a pattern?
14         **MR. GAWLEY:**  That addressed continuity.
15         **THE COURT:**  What about pattern?
16         **MR. GAWLEY:**  I think the pattern is more -- I haven't
17 seen a case that says that the certification theory is
18 insufficient for a pattern in the RICO context.
19     I think it arises a lot in the false claims context
20 because there's a concern that the individual -- False Claims
21 Act is more concerned with individual claims than RICO, which
22 is more concerned with sort of a scheme.  But I don't have a
23 case that's on point here.
24         **THE COURT:**  All right.  I will take the matter under
25 submission.  Thank you.

1        **MS. MALKOFSKY:**  Your Honor --

2        **THE COURT:**  Yeah.

3        **MS. MALKOFSKY:**  Are we addressing the -- sorry, the
4  causes of action with respect to Ms. Tsanos at this point?

5        **THE COURT:**  I will in my papers.  I have your briefing
6  on that.  Thank you.

7        **MS. MALKOFSKY:**  Thank you.

8        **MR. GAWLEY:**  Thank you, Your Honor.

9        **THE COURT:**  Thank you.

10    I think I have to decide this critical question.  I was
11 going to ask you whether there's any utility to referring this,
12 in terms of ADR, but I think I'm going to have to resolve this.
13 This is such a major juncture in the road that what I'll do is
14 I will schedule a further follow-up case management conference
15 once I resolve this threshold question.

16       **MS. MALKOFSKY:**  Thank you, Your Honor.

17       **THE COURT:**  Thank you.

18    (At 2:00 p.m. the proceedings were adjourned.)

19                         - - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, January 31, 2022

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter